Henry HUDSON, et al., Plaintiffs,

v.

Edward BURKE and the City of Chicago, Defendants.

No. 83 C 5785.

United States District Court, N.D. Illinois, E.D.

Sept. 24, 1985.

Aram Hartunian, Joel M. Hellman & Benjamin A. Streeter, III, Hartunian, Futterman & Howard, Chicago, Ill., for plaintiffs.

Jerold S. Solovy, Joseph G. Bisceglia, Donald J. Rendall, Jr., Jenner & Block, Jerome H. Torshen, Mark Schoenfield & Robert J. Slobig, Jerome H. Torshen, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs Lafayette Blackmon, Gwen Flowers, Henry Hudson, Ruby Thomas, John Laschiava and Whitney Valentine[1] brought this civil rights' action pursuant to 42 U.S.C. § 1983 for injunctive relief and damages claiming that the defendants Alderman Burke ("Burke") and the City of Chicago (the "City") violated plaintiffs' First and Fourteenth Amendment rights by terminating their employment as investigators for the City Council's Finance Committee. The terminations allegedly resulted because plaintiffs were supporters of Mayor Washington and Alderman Frost, who are purportedly political "enemies" of Alderman Burke. All of the parties have filed motions for summary judgment.

Summary judgment is a drastic remedy which should be granted only when it is clear that the requirements of Rule 56, F.R.Civ.P., have been met. As the Supreme Court in *Poller v. Columbia Broadcasting*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1961) admonished:

> Summary judgment should be entered only when the pleadings, depositions, affidavits and admissions filed in the case show that ... there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... [summary judgment is appropriate only] ... where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial....

All allegations and inferences are to be construed in the light most favorable to the party opposing the motion. However, "to create a question of fact, an adverse party responding to a properly made and supported summary judgment motion must set forth specific facts showing that there is a genuine issue for trial." *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983). A party may not rest on mere allegations or denials of his pleadings; similarly, a bare allegation that an issue of fact exists is insufficient. *Shacket v. Philco Aviation, Inc.*, 681 F.2d 506, 513 n. 8 (7th Cir.1982).

For the reasons set forth below, the City's motion for summary judgment is granted. Alderman Burke's motion is granted in part and denied in part, and the plaintiffs' motion for summary judgment is denied.

## BACKGROUND FACTS[2]

Prior to May 1983, Alderman Frost was the Chairman of the City Council Finance Committee. (Complaint, ¶ 10; Burke Dep., p. 27.) Pursuant to Rule 37 of the Rules of the City Council, the Finance Committee has jurisdiction:

> ... over the City budget, tax levies, industrial revenue bonds and revenue bond

---

1. When the action was originally filed, Clarence Bell and W. Ronald Lambert were also named plaintiffs, but they were subsequently dismissed. Gwen Flowers was added as a plaintiff on June 14, 1984, in a supplemental pleading.

2. The statement of undisputed facts is taken from the pleadings, depositions, and statements of Material Facts As To Which There Is No Genuine Dispute filed by defendants in support of their motions pursuant to the Local Rules.

Plaintiffs filed no response to the statements filed by defendants, and did not submit their own statement in support of their motion for summary judgment as required by this Court's rule. While this is bad practice, the Court will not, as suggested by defendants, grant or deny the pending motions on that ground. The Court will treat those statements of fact (when supported by the record) made in plaintiffs' briefs as their recitation of facts.

programs, revenue and expenditure orders, ordinances and resolutions, the financing of municipal services and capital developments; and matters generally affecting the Budget office, the Department of Finance, and the solicitation of funds for charitable or other purposes on the strees and other public places.... [and] all matters pertaining to the audit and review of expenditures of funds appropriated by the Council or under the custody of the City Treasurer, and all claims under the Illinois Worker's Compensation Act.

The plaintiffs were hired as investigators on the Finance Committee staff by Frost, except for plaintiff Hudson who was hired based on Frost's letter of sponsorship to the prior chairman. (Blackman Dep., pp. 32, 37–38; LaSchiava Dep., p. 69; Hudson Dep., pp. 24–25, 29; Thomas Dep., pp. 55–56.) During Frost's tenure as Chairman, investigators acted principally as claims adjusters, conducting field investigations of three kinds: (a) small property damage claims brought against the City; (b) claims brought by police and firemen for work-related personal injuries and (c) workers' compensation claims filed by city employees. (Bell Dep., pp. 18–20.) Plaintiffs conducted interviews, took witness statements and processed documents. (Flowers Dep., pp. 29–39.) Plaintiffs, most of whom were precinct captains, also performed political work for Alderman Frost and his 34th Ward Organization. (Blackman Dep. pp. 5–6; LaSchiava Dep., pp. 14–15; Hudson Dep., pp. 38–42; Flowers Dep. pp. 24–25; Valentine Dep., p. 30; Thomas Dep., pp. 41–42.)

On May 2, 1983, during a now legendary session of the City Council, Mayor Washington unsuccessfully attempted to adjourn the Council meeting to prevent the majority block of alderman (referred to in the media as the "Vrdolyak 29") from realigning committee chairmanships and altering Council rules. Alderman Frost and a minority faction of the Council walked out of the Council chambers after the Mayor's "adjournment"; however, a majority of the council members remained and continued to conduct Council business. During this post-"adjournment" session, Alderman Burke was elected Chairman of the Council Finance. (Complaint, ¶ 9–10; Burke Dep., pp. 15, 38, 131, 162, 168.)

The Illinois Appellate Court upheld the legality of the City Council meeting at which Alderman Burke was elected Finance Committee Chairman. *Roti v. Washington* and *Rush v. Kozubowski*, 114 Ill. App.3d 958, 71 Ill.Dec. 30, 450 N.E.2d 465. However, Alderman Frost refused to vacate the Finance Committee office or to allow Alderman Burke access for approximately two months. (Burke Affidavit, ¶ 7.) Alderman Frost finally relinquished the Chairman's office after the Illinois Supreme Court refused to review the Appellate Court's decision. (Burke Dep., pp. 109–110.)

After Alderman Burke was elected Chairman of the Finance Committee, he determined that the Committee should take a more aggressive and active role than before to monitor City government activities and financial affairs. (Burke Dep., pp. 26, 61, 62, 67, 72, 75.) Burke therefore allegedly decided to change the duties of the Finance Committee investigators. In addition to investigations of workmen's compensation claims and injured-on-duty claims of police and firefighters, the investigators were to gather factual information concerning needs for and delivery of City services. Burke claims that under his leadership, the upgraded responsibilities of the investigators' work have included:

Discovery that City departments had cars in excess of those provided in the City budget, which led to passage of an ordinance limiting the number of City vehicles. (Burke Dep. at 73–74, 91; Kubasiak affidavit at 4a.)

Discovery that an ex-City employee was being chauferred around the City by a City employee using a City car. This information helped lead to a requirement in the 1984 ordinance that each City agency report its utilization of each vehicle to the Finance Committee. In addition, there is a current investigation of the excessive use of City employee

chauffers and City vehicles by City administrators after normal working hours. (Kubasiak affidavit at 4b; Burke Dep. at 74, 83–85, 88, 91.)

Investigation and evaluation of actual and potential recipients of community block grant funds including site visits, interviews, examinations of records, after which a community development grant budget was created with line items which track annual appropriations ordinance and demonstrate the specific use of funds. (Burke Dep. at 77–78, 114–15, 117; Kubasiak Dep. at 70.)

On-site inspections of work by persons under contract to perform City functions (Burke Dep. at 111, 123), as well as proposed contracts (Kubasiak Dep. at 101–102) and gathering of factual information to determine whether those persons are capable of performing properly (Kubasiak affidavit at 4c.)

Investigations of complaints regarding the efficiency of City departments' operations, including use of motor fuels tax revenue, since the City Department of Public Works must receive specific allocations from the City Council, as well as because the Finance Committee is mandated by ordinance to determine whether all appropriations are being used efficiently and in accord with the appropriations. (Burke Dep. at 111, 119–20.)

Examination of the delivery of services by various City departments to provide information concerning whether they are efficient and for use in establishing priorities and needs in the budget and appropriations process. (Kubasiak affidavit at 4d.)

A survey and analysis of abandonded buildings, which was used in determining needs and priorities for various City services and appropriations. (Kubasiak affidavit at 4e.)

Factual research regarding other legislative issues, including the use of motor fuels tax revenue since the Finance Committee is mandated by ordinance to determine whether such funds are being used efficiently and in accord with City Council appropriations. (Kubasiak affidavit at 4f.)

These duties, it is contended, include investigations of matters which are politically sensitive, because the results could reflect well or poorly on various elected officials and politicians. (Kubasiak Dep., pp. 98–99.)

Upon assuming the Chairmanship of the Finance Committee, Alderman Burke met with Edward Bell, who was then serving as the committee's Chief Administrative Officer. Among the topics discussed were the nature of the job responsibilities performed by the employees of the Finance Committee, and the identities of the employees of political sponsors. (Bell Dep., pp. 44–46, 49–54, 78–79.) Burke learned that plaintiffs were politically affiliated with Alderman Frost. (Burke Dep., 249–250.)

During July, 1983, plaintiffs were fired from their positions as investigators for the Finance Committee by Alderman Burke. Plaintiffs allege that the "sole motive, purpose and reason" for their firings was their political beliefs and associations—namely, their association with Frost and Washington. (Complaint, ¶ 11.)

Mr. Burke explained his reasons for terminating the plaintiffs' employment as follows:

Q. You felt that you were better off if those appointees were out of the office for confidentiality and security reasons, is that correct?

A. Well, I think that it is reasonable to assume if they were tied to Alderman Frost, and their loyalty was to Alderman Frost, that we could expect that we would not receive from them the confidentiality and dedication that would be required of employees to the new chairman.

Q. In fact, you did anticipate that problem, is that correct?

A. That was one of the reasons they were dismissed.

Q. What other reasons?

A. It would appear from our examination of what was going on that many of them were incompetent. The police and fire claims were in a total mess. There were claims dating back for years

that hadn't been acted on. Some were buried in drawers someplace.

The unions were complaining about the treatment that the police and fire members were getting from the committee. Bills would go unpaid. Firemen and policemen were being sued for nonpayment of bills. There was a lack of recovery from third party payers in cases that were pending in court, and that's been rectified. The record speaks for itself. There is an increase in tens of thousands of dollars in recoveries from third party payers on liens that should have been collected years ago.

Q. What other reasons?

A. I felt that, first of all, they were exempt from the Shakman ruling. There was no obligation on our part to continue their employment. They constituted a group of people that were loyal to the prior chairman who would impede our desire to put the committee on a new footing.

They just didn't seem to be capable of devoting themselves and their time to that function. Moreover, some of them had other jobs. And I felt it was important to start with a new team.

Q. Of people personally loyal to you?

A. Loyal to the chairman, who would not breach the confidentiality and security that was necessary in my opinion to the functioning of the committee.

Q. How did you think that the plaintiffs in this case were going to impede your desire to put the committee on a new footing?

A. They apparently were political functionaries of Alderman Frost who were put on the payroll by Alderman Frost, who did political work for Alderman Frost, who belonged to his political organization, and as near as we could tell did little or nothing in terms of their City jobs other than work the precincts for Alderman Frost.

(Burke Dep. pp. 159–161.)

*The Pending Motions*

All of the parties have filed motions for summary judgment. The City's motion is predicated upon the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which precludes the imposition of liability upon a municipality under 42 U.S.C. § 1983 based solely upon principles of *respondeat superior*. For the purposes of his motion, Alderman Burke assumes *arguendo* that plaintiffs' political affiliation was in fact the sole cause for their termination, but argues that, as a matter of law, political affiliation is a constitutionally permissible criterion for the jobs in question. Alderman Burke has also moved for summary judgment arguing that plaintiffs' action is barred by the doctrines of legislative immunity, and/or a qualified "good faith" immunity to Section 1983 liability. Plaintiffs' motion for summary judgment argues that plaintiffs were victims of political firings, political affiliation was not an appropriate requirement of plaintiffs' jobs, and that Burke has no legislative or "good faith" immunity from liability.

These motions are discussed below.

## I.

### UNDER SECTION 1983, THE CITY MAY NOT BE HELD VICARIOUSLY LIABLE FOR THE CONDUCT OF ALDERMAN BURKE, ABSENT PROOF OF A CITY CUSTOM OR PRACTICE

■ The Supreme Court recently reiterated the elements of a claim under 42 U.S.C. § 1983. Plaintiff must plead that (1) a person (2) acting under color of state law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) to the deprivation of a right secured by the Constitution or laws of the United States. *City of Oklahoma v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, J. concurring at p. ——, 105 S.Ct. 2439). Section 1983 creates no substantive rights: "it merely provides remedies for deprivations of rights established elsewhere." *Id.*, (plurality opinion at ——, 105 S.Ct. at 2441).

■ A municipality can be found liable under Section 1983 only if a plaintiff has

been injured by reason of a governmental policy or custom. A simple employment relationship between the primary offender and a municipality is not a sufficient basis for a city's liability. *Monell, supra,* 436 U.S. at 694, 98 S.Ct. at 2037. Moreover, the liability of a city cannot be premised upon proof of a single incident of unconstitutional activity. To do so would essentially impose liability upon a city "simply because the municipality hired one 'bad apple.' " *Tuttle, supra.*

■ In the instant case, plaintiffs do *not* allege that their firings resulted from any City policy or custom. It is undisputed that the decision to terminate the plaintiffs' employment was Alderman Burke's alone. (Burke, Dep., pp. 129, 139, 142, 158–60, 178, 180.) Burke received no input from other members of the City Council with respect to his decision. (Burke Dep., pp. 266–67.) He did not consult with the mayor's office or the Department of Personnel prior to firing the plaintiffs. (Hill Aff. ¶ 5.) The positions held by plaintiffs were exempt from the career service rules contained in the Municipal Code and the personnel rules and regulations established by the City Department of Personnel. (Hill Aff., ¶¶ 3, 4.) In short, the City's only involvement with plaintiffs' firing is that the decision to terminate them was made by an Alderman. Under the reasoning of *Monell* and *Tuttle,* that relationship alone is not enough.

The case of *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983) does not alter this result. In *Reed,* a factual question was presented as to whether the actions of the mayor and other village officials constituted "a *policy* orchestrated at the highest level of government in the Village of Shorewood. If so ... the Village would be liable." (*Id.,* at 953; emphasis supplied.) Here, there is no evidence whatsoever that the actions of Alderman Burke amounted to "a policy orchestrated at the highest levels of [City] government." The mere fact that an action is taken by an individual Alderman does not *ipso facto* make the decision one of City "policy". Accordingly, the City's motion for summary judgment must be granted.

## II.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

■ Although public employees such as the plaintiffs here have no entitlement to public employment, such employment is a government benefit that cannot be conditioned in a way that penalizes the exercise of the rights of free belief and association. *Branti v. Finkel,* 445 U.S. 507, 514–17, 100 S.Ct. 1287, 1292–94, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 358–60, 96 S.Ct. 2673, 2682–83, 49 L.Ed.2d 547 (1976). "[A] public agency that fires an employee because of his political beliefs or political affiliations infringes his freedom of speech ..."—unless, of course, it can be said that the employee is either a "policymaker" or a "confidential employee". *Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir.1985). "Policymaker" or "confidential employees" can be fired for political reasons with impunity.

The distinction drawn between policymakers and nonpolicymakers is admittedly fuzzy. The plurality opinion in *Elrod, supra,* stated: "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position ... Consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals." *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. The Seventh Circuit, while acknowledging that the "determination of status as a policymaker in many cases presents a difficult factual question," has prescribed the following test:

> "... whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision making on issues where there is room for principled disagreements on goals or their implementation."

*Nekolny v. Painter,* 653 F.2d 1164, 1169, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

The definition of a "confidential employee" is no more concrete. The Seventh Circuit has acknowledged that " 'considerations of personal loyalty ... may justify the employment of political associates in certain positions,' but these factors would not apply to 'positions such as janitors, elevator operators or school teachers.' " *Tomczak v. The City of Chicago*, 765 F.2d 633, 640 (7th Cir.1985), quoting *Illinois State Employees Union Local 34 v. Lewis*, 473 F.2d 561, 564 (7th Cir.1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). All that can be said with certainty with regard to "confidential employees" is that "[i]f Rosalynn Carter had been President Carter's secretary, President Reagan would not have had to keep her on as his Secretary." *Soderbeck, supra*, 752 F.2d at 288.

As an alternative to labeling positions as policymaking or confidential, the *Branti* court posed the question as follows: "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." 455 U.S. at 519, 100 S.Ct. at 1295. Yet, the Seventh Circuit has still persisted in utilizing the jargon of "policymaking" and "confidential" in determining whether political affiliation can be considered for certain positions. *Nekolny, supra; Soderbeck, supra; Tomczak, supra.*

■ A non-policymaking/non-confidential employee claiming to be the victim of a political firing has the burden of showing that his protected conduct was a "substantial factor" or "motivating factor" in the decision to terminate his employment. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Nekolny v. Painter*, 653 F.2d 1164, 1167 (1981). As the Seventh Circuit has stated, "[t]hat burden is not significant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendants' opponent in the election." *Nekolny, supra*, at 1168. Indeed, "[t]his standard is not satisfied if the plaintiff shows only that

elimination of the protected activity may have been welcomed by the defendant or even that such activity played some minor role in the discharge decision." *McClure v. Cywinski*, 686 F.2d 541, 546 (7th Cir.1982). Once the plaintiff has met that burden, the defendant has the burden of showing that he would have reached the same decision as to the firing even in the absence of the protected conduct. *Mt. Healthy City, supra.*

■ The Court need not address all of the points raised by plaintiffs in support of their motion for summary judgment, for it is clear that at the very least, material issues of fact exist concerning (1) the nature of the investigator positions; and (2) whether plaintiffs' political beliefs or affiliations were a "substantial" or motivating factor in the decision to terminate their employment.

While plaintiffs characterize the Finance Committee investigators as nothing more than glorified claims adjusters, Alderman Burke maintains that they have significant input into the development of legislative proposals and work on confidential and sensitive investigations. Alderman Burke has denied in his Answer that plaintiffs' terminations resulted solely from political affiliations, and has contended in his deposition testimony that plaintiffs would have been fired regardless of their affiliation with Alderman Frost because of their performance and attendance records.

The Court cannot accept plaintiffs' argument that Burke waived his right to assert that plaintiffs would have been fired regardless of political affiliation by failing to plead it as an affirmative defense. The denial in Burke's Answer and his deposition testimony clearly put this matter at issue. Plaintiffs can hardly claim surprise concerning this defense. However, in the interest of fairness, Burke will be given 14 days to amend his answer to raise this defense as an affirmative defense because "justice so requires." Rule 15(a), F.R. Civ.P. Plaintiffs will be given leave to conduct whatever further discovery they

feel is required with regard to that defense, and that defense alone.

Accordingly, plaintiffs' motion for summary judgment is denied.

### III.

### ALDERMAN BURKE'S MOTION FOR SUMMARY JUDGMENT IS DENIED IN PART AND GRANTED IN PART

A. Material Factual Issues Preclude Summary Judgment in Favor of Alderman Burke on the Appropriateness of Considering Political Affiliation in Firing Plaintiffs.

For the reasons previously discussed in section II, *supra,* the Court finds that an issue exists as to the facts regarding the nature of the investigator position for the Finance Committee under the chairmanship of Alderman Burke. These facts are material and preclude summary judgment on the appropriateness of considering political affiliation in firing plaintiffs.

B. Material Factual Issues Concerning the Applicability of the Doctrine of Legislative Immunity Preclude Summary Judgment on this Defense.

If the doctrine of legislative immunity is applicable, it absolutely bars plaintiffs' action. *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668, 671 (7th Cir., 1985).

The privilege of legislators to be free from civil liability for what they do or say in legislative proceedings was a long recognized principal of English law. The Founding Fathers deemed the privilege "so essential that it was written into the Articles of Confederation and later into the Constitution." *Tenney v. Brandhove,* 341 U.S. 367, 372, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951). Article I, § 6 of the Constitution provides:

... for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other place.

■ Of course, the Constitution's Speech or Debate Clause confers no immunity upon state or local legislators. The Supreme Court has, however, extended a federal common law immunity from suit under 42 U.S.C. § 1983 to state legislators acting "in the sphere of legitimate legislative activity." *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 731–32, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980). Municipal legislators also enjoy such immunity. *Reed v. Village of Shorewood,* 704 F.2d 943, 952 (7th Cir.1983). The purpose of the immunity

... is based on the need for an independent legislative branch, free from the coercion of restraint imposed by inquiry from other governmental authority, as well as from the time consuming problem of legislators having to defend their official acts in court.

*Agromayor v. Colberg,* 738 F.2d 55, 58 (1st Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 515, 83 L.Ed.2d 405 (1985).

■ The immunity does not encompass everything that a legislator might do while in office, however. Administrative functions are not protected. Only a legislator's conduct while "acting in the sphere of legitimate legislative activity" is immunized. *Tenney v. Brandhove,* 341 U.S. at 376, 71 S.Ct. at 788. Although the Constitution speaks only of "speech or debate", the Supreme Court has broadly construed the Constitutional protection to cover a wide range of legislative activity including "[c]ommittee reports, resolutions, and the act of voting ...' [i]n short, ... things generally done in a session of the House by one of its members in relation to the business before it.'" *Gravel v. United States,* 408 U.S. 606, 617, 92 S.Ct. 2614, 2623, 33 L.Ed.2d 583 (1972), quoting *Kilbourn v. Thompson,* 103 U.S. (13 Otto) 168, 204, 26 L.Ed. 377 (1881). "Investigations, whether by standing or special committees" have been recognized to be within the sphere of legitimate legislative activity, absent a showing that there was a usurpation of functions exclusively vested in the Executive or Judiciary. *Tenney, supra,* 341 U.S. at 377, 71 S.Ct. at 788. The immunity has also been extended to legislative aids or assistants because:

it is literally impossible in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aids and assistants; that the day-to-day work of such aids is so critical to the Members' performance that they must be treated as the latter's alter-egos ...

*Gravel, supra,* 408 U.S. at 617–18, 92 S.Ct. at 2623.

In the instant case, Alderman Burke asserts that his decision to terminate plaintiffs' employment as Finance Committee investigators was within "the sphere of legitimate legislative activity" and thus immunized. Plaintiffs contend that the firing of Finance Committee investigators is an administrative, not legislative, act and thus argue that no protection is afforded to Alderman Burke by legislative immunity.

This Court has no clear guidance from the Supreme Court or from the Seventh Circuit concerning this issue. Most courts when called upon to differentiate between "legislative" and "administrative" acts have candidly recognized that "[n]o bright line delineates ... administrative actions from ... legislative functions ... Hence, whether defendants' [firing of] plaintiff[s] was an administrative or legislative function does not admit to facile resolution." *Detz v. Hoover,* 539 F.Supp. 532, 534 (E.D. Pa.1982).

Employment decisions concerning employees having no connection whatsoever with the legislative process have generally been held to be administrative acts not subject to legislative immunity, even if such decisions were voted on by legislators. *See e.g., Detz v. Hoover, supra,* (police chief); *Visser v. Magnarelli,* 542 F.Supp. 1331 (N.D.N.Y.1982) (city clerk); *Walker v. Jones,* 733 F.2d 923 (D.C.Cir.1984) (restaurant manager). Such decisions do not answer the question presented here, however, because Alderman Burke contends that the investigators do have some connection with the legislative process. The Courts of Appeals of two circuits confronted with similar cases have arrived at opposite conclusions.

In *Davis v. Passman,* 544 F.2d 865 (5th Cir.1977), *reversed en banc on other grounds on rehearing,* 571 F.2d 793 (5th Cir.1978), *reversed on other grounds,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), Congressman Passman fired his Deputy Administrative Assistant because she was a woman. The Fifth Circuit held that the Congressman was not immune to the assistant's Fifth Amendment claim. The court held, with Judge Jones dissenting, that the firing of Congressional employees was not within the legitimate scope of legislative activity:

Such dismissal decisions certainly are not "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. at 2627. Peripheral or tangential activities of a representative must not be confused with the legislative core. A representative's transgressions are not given absolute absolution. The Constitution establishes an immunity for aberrations in a representative's legislative activities, but members of Congress become mere mortals when they operate in more mundane fields. When members of Congress dismiss employees they are neither legislating nor formulating legislation. The fear of judicial inquiry into dismissal decisions cannot possibly affect a legislator's decisions on matters pending before Congress. 544 F.2d at 880.[3]

---

**3.** The Fifth Circuit *en banc* reversed the panel's decision, not resolving the issue of legislative immunity. (571 F.2d 793 (5th Cir.1978)) The Supreme Court reversed the *en banc* decision. Although the Court did not reach the issue of legislative immunity, three dissenting justices suggested that the issue of legislative immunity should have barred plaintiff's action. (442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).) *See* discussion *infra.*

The First Circuit in *Agromayor v. Colberg,* 738 F.2d 55 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 515, 83 L.Ed.2d 405 (1985), reached the opposite conclusion. In *Agromayor,* a journalist brought a civil rights action against the Speaker of the House of Representatives of the Commonwealth of Puerto Rico for alleged violations of his Constitutional rights in being denied employment as a legislative press officer because of political affiliation and national origin. The legislator moved to dismiss, in part, because the plaintiff's suit was barred by legislative immunity. The motion was denied and the legislator appealed.

On appeal, the First Circuit reversed. Senior Judge Bailey Aldrich, speaking for the court, acknowledged that "the scope of 'legitimate legislative activity' subject to immunity ... is ill-defined," but stated:

> To the extent that an employee's function is "essential" to the legislative process, his qualifications, and hence his proper selection, should be correspondingly essential. The question we must answer is, to what extent should a legislator be immune from judicial inquiry in determining those essential questions?

738 F.2d at 59. Reviewing the decision in *Davis, supra,* Judge Aldrich observed that in the opinion of three dissenting justices of the Supreme Court, Congressman Passman should have been immune because:

> A Member of Congress has a right to expect that every person on his or her staff will give total loyalty to the political positions of the Member, total confidentiality, and total support. This may, on occasion, lead a Member to employ a particular person on a racial, ethnic, religious, or gender basis thought to be acceptable to the constituency represented, even though in other branches of Government—or in the private sector—such selection factors might be prohibited....

> . . . .

At this level of Government—staff assistants of Members—long-accepted concepts of separation of powers dictate, for me, that until Congress legislates other-wise as to employment standards for its own staff, judicial power in this area is circumscribed. *Davis v. Passman,* ante, 442 U.S. at 249–50, 99 S.Ct. at 2279 (Burger, C.J., dissenting).

Judge Aldrich explained further that the dissenting justices' views "expressed a proper common law concern beyond strict speech and debate or comparable immunity that courts should exhibit towards legislators, state or federal." *Id.,* at 60.

The *Agromayor* court recognized, however, that "not all employment raises a legislative interest." *Id.* The Court concurred with the result in *Walker v. Jones, supra,* which held that the position of House restaurant manager has no meaningful input with regard to the legislative functioning. "However, any employee dealing with 'the deliberative and communicative process' ... must be of direct legislative importance." *Id.* The First Circuit concluded that if there is "enough opportunity for 'meaningful input' into the legislative process" the employment decision should be immunized. *Id.*

■■■ This Court believes that the *Agromayor* approach is correct and more consistent with the policy considerations which underlie the legislative immunity. The *Davis* Court's analysis totally ignores the realities of the modern legislative process previously recognized by the Supreme Court that "it is literally impossible ... for [legislators] to perform their legislative tasks without the help of aids and assistants ..." *Gravel, supra,* 408 U.S. at 617, 92 S.Ct. at 2623. To the extent that such aids or assistants have some opportunity for meaningful input into the legislative process, this Court believes that the decision to hire or fire such aids or assistants is within the sphere of legitimate legislative activity.

■■■ The question thus becomes do investigators for the Finance Committee have the opportunity for meaningful input into the legislative process? The facts presented by the parties leave that question in dispute. Alderman Burke has submitted evidence suggesting that the Committee investigators have participated in

investigations which have formed the basis of proposed or enacted legislation. *See supra*, pp. 1503–1505. Plaintiffs have countered that the investigators still process workmen's compensation claims.

Of course, the fact that investigators perform some administrative and some legislative tasks is not determinative. As the *Agromayor* court explained:

> ... in applying the immunity we decline to inquire deeply into the functions performed by a particular personal legislative aide, inasmuch as such an inquiry itself threatens to undermine the principles that absolute immunity was intended to protect. Personal aides may perform a variety of tasks, only some of which are vital to the legislative process.

*Agromayor, supra* at 60. Nor does the fact that the investigators are employees of the Finance Committee, rather than personal aides to Alderman Burke, mean that Alderman Burke's decision to fire plaintiffs and hire other investigators is not within the sphere of legitimate legislative activity. It is undisputed that the function of hiring and firing of Finance Committee staff has been delegated by the Committee to the Chairman. How the Finance Committee chooses to manage its hiring/firing decisions "is a legislative matter, not our concern." *Id.*, at 60 n. 4.

However, after reviewing the deposition transcripts submitted, the Court is unable to determine with any certainty whether the investigators meet the *Agromayor* test or not.

Alderman Burke's motion for summary judgment based upon legislative immunity must therefore be denied because material factual issues remain to be resolved.

### C. Alderman Burke's Qualified Immunity Does Bar Plaintiffs' Claims For Damages.

Although this Court is unable to resolve summarily the issue of legislative immunity on the record presented, the question of qualified immunity is different. The standard for qualified immunity was set down in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 819, 102 S.Ct. 2727, 2738, 2739, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have know.

The standard is an objective one, and does not depend upon the subjective state of mind of the official. *Gannon v. Daley*, 561 F.Supp. 1377, 1388 (N.D.Ill.1983). The qualified immunity, however, only bars an action for monetary relief; it is inapplicable to requests for injunctive relief. *Wood v. Strickland*, 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975).

Alderman Burke claims that he should be afforded qualified immunity because he relied in good faith upon a June 1983 *Shakman* Consent Decree which listed plaintiffs' position as exempt from the prohibition of political firings. Plaintiffs counter that such an argument is precluded by Judge Marshall's decision in *Gannon v. Daley*, 561 F.Supp. 1377 (N.D.Ill.1983) which rejected a similar argument. Plaintiffs further argue that since they are clearly neither policymakers nor confidential employees, Alderman Burke had to know that he was violating their constitutional rights by firing them for political reasons.

The Supreme Court's recent case of *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) highlights the appropriate line of inquiry. *Mitchell* involved a suit for damages against a former Attorney General of the United States who had authorized a warrantless wiretap on the respondent. The District Court held that the Attorney General was not absolutely or qualifiedly immune from suit. The Court of Appeals affirmed the lower court's ruling with regard to absolute im-

munity, but held that the ruling on qualified immunity was not ripe for appeal. The Supreme Court granted certiorari and affirmed the ruling on absolute immunity, but found that the ruling on qualified immunity was appealable and erroneous. The Court explained:

> The legality of the warrantless domestic security wiretap Mitchell authorized in November 1970, was, at that time, an open question, and *Harlow* teaches that officials performing discretionary functions are not subject to suit when such questions are resolved against them only after they have acted. The District Court's conclusion that Mitchell is not immune because he gambled and lost on the resolution of this open question departs from the principles of *Harlow.* Such hindsight-based reasoning on immunity issues is precisely what *Harlow* rejected. The decisive fact is not that Mitchell's position turned out to be incorrect, but that the question was open at the time he acted. Hence, in the absence of contrary directions from Congress, Mitchell is immune from suit for his authorization of the Davidson wiretap notwithstanding that his actions violated the Fourth Amendment.

In words that are *apropo* for the instant case, the Court observed:

> We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is *a legitimate question* whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law.

— U.S. at ——; —— n. 12, 105 S.Ct. at 2819–20; 2820 n. 12.

When Alderman Burke made his decision to fire plaintiffs, *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) was the controlling statement on the permissibility of political firings. But *Branti* did not absolutely forbid dismissals for political reasons. *Branti* in fact *permits* political firings if the "hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." 445 U.S. at 519, 100 S.Ct. at 1295. This is in essence the reasoning that has lead courts to categorize such positions as "policymaking" or "confidential". *E.g., Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir.1985).

As the Seventh Circuit has acknowledged, the "determination of status as a policymaker in many cases presents a difficult factual question." *Nekolny v. Painter,* 653 F.2d 1164, 1169 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). But that is not always the case. "[P]ositions such as janitors, elevator operators or school teachers" are clearly ones for which political affiliation could never be considered an appropriate job criterion. *Tomczak v. The City of Chicago,* 765 F.2d 633, 640 (7th Cir.1985), quoting *Illinois State Employees Union Local 34 v. Lewis,* 473 F.2d 561, 564 (7th Cir. 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). Similarly, political affiliation would clearly not be appropriate for positions such as bus drivers or secretary-dispatchers (*Nekolny v. Painter, supra*) or clerks (*Gannon, supra).*

 To determine whether Alderman Burke can successfully assert a qualified immunity from suit, the Court assumes plaintiffs were fired for political reasons. The Court must then determine if *"there is a legitimate question"* whether political affiliation was an appropriate requirement for plaintiffs' positions. It seems clear to this Court that there was a legitimate question on this issue. Classification of the positions in question presents "a difficult factual question" (*Nekolny, supra*) not susceptible to facile resolution. Under the reasoning of *Mitchell, supra,* subjecting Alderman Burke to monetary liability "because he gambled and lost on the resolu-

tion of this open question departs from the principles of *Harlow*." *Mitchell, supra.* The "decisive fact" is not whether Alderman Burke's legal position ultimately turns out to be correct or incorrect, "but that the question was open at the time he acted." *Id.* Thus, while the Court does not "suggest that an official is always immune" simply because the positions in question have never been litigated, (*id.*) the Court holds that qualified immunity is applicable here because "a legitimate question" existed (and continues to exist) as to whether political affiliation was an appropriate consideration in firing plaintiffs. Plaintiffs claim for damages will be dismissed, but their claims for injunctive relief based upon the record presently before the Court will be allowed to proceed.

## CONCLUSION

For the reasons set forth, the motion of defendant City of Chicago for summary judgment is GRANTED, plaintiffs' motion for summary judgment is DENIED and defendant Burke's motion is GRANTED in part and DENIED in part. Defendant Burke is granted leave to file within 14 days an amended Answer setting forth additional affirmative defense matters. The parties are given 21 days thereafter to complete additional discovery, if any is desired, on the new matters, and only the new matters, raised in the amended Answer.

Case set for a report on status at 9:15 a.m., November 6, 1985.