**Henry HUDSON, et al.,
Plaintiffs–Appellants,**

v.

**Edward M. BURKE and the City of
Chicago, Defendants–Appellees.**

**No. 89–2601.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1990.

Decided Sept. 18, 1990.

---

Aram A. Hartunian, James G. Bradtke, Hartunian, Futterman & Howard, Chicago, Ill., for plaintiffs-appellants.

Arthur N. Christie, CC, Ruth M. Moscovitch, Kelly R. Welsh and Jean Dobrer, ACC, Office of Corp. Counsel, Appeals Div., Jerome H. Torshen, Mark K. Schoenfield, James K. Genden, Torshen, Schoenfield & Spreyer, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

MANION, Circuit Judge.

Appellants are former employees of the City of Chicago Finance Committee who lost their jobs when their alderman, Wilson Frost, was displaced as committee chairman. They sued the new committee chairman, Edward M. Burke, and the City for violating their constitutional rights pursuant to 42 U.S.C. § 1983. Prior to trial, the district court granted Chicago's motion for summary judgment, and granted Burke's motion for summary judgment on the issues of damages and qualified immunity. *Hudson v. Burke,* 617 F.Supp. 1501 (N.D. Ill.1985). The case proceeded to a bench trial in 1986 on appellants' request for injunctive relief against Alderman Burke for reinstatement.

There is no dispute that appellants were replaced for political reasons. The only question is whether their jobs were sufficiently political to justify Burke's consideration of political affiliation in firing them, thereby immunizing his decision from constitutional scrutiny under the Supreme Court's line of patronage cases beginning with *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).[1] After a

---

1. *See also Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Illinois,* — U.S. —, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). *Rutan* is the Supreme Court's latest statement on patronage but it may not be the last. Four of the eight Justices now sitting on the Court conclude that *Elrod* and *Branti* should be overruled rather

bench trial the district court entered judgment for the defendants. The appellants challenge the district court's conclusion that their positions were not constitutionally protected, and that they would have been fired anyway for poor work performance. They also appeal the district court's 1986 decision to grant summary judgment for the City of Chicago. Burke renews his contention that the district court erred by failing to grant him legislative immunity. We affirm.

## I. Background

All six appellants were hired by the City of Chicago Finance Committee between 1975 and 1980. While their job duties varied, all were considered "investigators" or "legislative aides" (the terms were used interchangeably) for the committee. John Laschiava, Henry Hudson, Lafayette Blackmon and Ruby Thomas handled claims against the City, usually either small property damage claims, claims against the City by policemen and firemen for work-related injuries, or worker's compensation claims by City employees. Whitney Valentine also worked with claims, but her job was to assign investigators to gather information requested by department heads. Gwen Flowers was a clerical employee who reviewed files and assisted in processing claims.

The appellants were political hires; all were hired "by Frost, except for ... Hudson who was hired based on Frost's letter of sponsorship to the prior chairman.... [M]ost of [the appellants] were precinct captains [and] also performed political work for Alderman Frost and his 34th Ward Organization." *Hudson v. Burke*, 617 F.Supp. at 1504.

The district court in *Hudson v. Burke*, *id.* summarized the highly charged political atmosphere surrounding the events that gave rise to this case:

On May 2, 1983, during a now legendary session of the City Council, Mayor Washington unsuccessfully attempted to adjourn the Council meeting to prevent the majority block of alderman (referred to in the media as the "Vrdolyak 29") from realigning committee chairmanships and altering Council rules. Alderman Frost and a minority faction of the Council walked out of the Council chambers after the Mayor's "adjournment"; however, a majority of the council members remained and continued to conduct Council business. During this post "adjournment" session, Alderman Burke was elected Chairman of the Council Finance....

The Illinois Appellate Court upheld the legality of the City Council meeting at which Alderman Burke was elected Finance Committee Chairman. *Roti v. Washington* and *Rush v. Kozubowski*, 114 Ill.App.3d 958, 71 Ill.Dec. 30, 450 N.E.2d 465 (1983). However, Alderman Frost refused to vacate the Finance Committee office or to allow Alderman Burke access for approximately two months.... Alderman Frost finally relinquished the Chairman's office after the Illinois Supreme Court refused to review the Appellate Court's decision....

Those were the controversial political circumstances under which Burke assumed control of the Finance Committee. After that council meeting, but before Frost vacated the chairman's offices, Frost instructed his staff, including the appellants, not to cooperate or turn committee documents over to Burke.

Rule 37 of the Rules of the City Council details the jurisdiction of the Finance Committee:

The Committee on Finance shall have jurisdiction over the City budget, tax levies, industrial revenue bonds and revenue bond programs, revenue and expenditure orders, ordinances and resolutions, the financing of municipal services and capital developments; and matters generally affecting the Budget office, the Department of Finance, and the solicitation of

than extended. *Rutan,* 110 S.Ct. at 2756 (dissenting opinion of Justice Scalia, joined by the Chief Justice, Justice O'Connor, and Justice Kennedy). For now these cases do apply and thus political terminations are limited accordingly.

funds for charitable or other purposes on the streets and other public places. The Committee shall have jurisdiction over all matters pertaining to the audit and review of expenditures of funds appropriated by the Council or under the custody of the City Treasury, and all claims under the Illinois Worker's Compensation Act.

The district court in *Hudson v. Burke,* 617 F.Supp. at 1504–05, described the changes Burke claimed to have made in the responsibilities of Finance Committee investigators, changes that allegedly enhanced the investigators' political roles:

> After Alderman Burke was elected Chairman of the Finance Committee, he determined that the Committee should take a more aggressive and active role than before to monitor City government activities and financial affairs.... Burke therefore allegedly decided to change the duties of the Finance Committee investigators. In addition to investigations of workmen's compensation claims and injured-on-duty claims of police and firefighters, the investigators were to gather factual information concerning needs for and delivery of City services ...

Burke assumed the office of Chairman of the Finance Committee in June 1983, thereby obtaining complete control over committee hiring and firing. He met with Edwin Bell, Chief Administrative Officer of the Finance Committee under Frost, and Dan Kubasiak, chosen by Burke as Bell's successor. Burke's discussions were about the nature of appellants' jobs, and also about the appellants' political sponsors. In mid-July 1983, Burke fired all the appellants but Flowers, who was fired in September 1983.

The district court denied Burke's motion for summary judgment because it concluded that genuine issues of material fact remained as to "(1) the nature of the investigator positions; and (2) whether [appellants'] political beliefs or affiliations were a 'substantial' or motivating factor in the decision to terminate their employment." 617 F.Supp. at 1508.

At trial Burke stipulated that political affiliation was a substantial and motivating factor in appellants' termination, but contended appellants would have been fired anyway because they were not qualified for the expanded work he had in mind for committee investigators, and because their previous work for the committee was not competent. Burke also argued that committee staff members were exempt from the constitutional restrictions on politically motivated employment decisions, relying on the conclusion in *Shakman v. Democratic Organization of Cook County,* 569 F.Supp. 177, 183 (N.D.Ill.1983), that "[e]mployees of the City Council" were exempt from an injunction against political hirings and firings.

For some unexplained reason the district court waited nearly three years to issue its memorandum opinion. The trial was held in late July of 1986, but the court did not issue its brief opinion until July 10, 1989. The district court, focusing on the "inherent powers" of the Finance Committee investigator positions, agreed that the investigators had input into politically sensitive areas of governmental decisionmaking on issues where there is room for principled disagreement. The court also held, in conclusory fashion, that the evidence supported Burke's contention that the appellants would have been terminated anyway due to poor work performance.

## II. Analysis

■ Appellants as a threshold matter contend that the district court's findings, in light of the long delay between trial and judgment, were inadequate under Fed.R. Civ.P. 52(a), which requires the court to "find the facts specially and state separately its conclusions of law thereon...." Although we do not understand or approve of the district court's delay in filing its order, the court's factual findings adequately support the ruling that the investigator positions were inherently political. The court described the jurisdiction of the Finance Committee, then outlined the inherent powers of committee investigators in light of Supreme Court and Seventh Circuit precedent. Further, appellants point to no au-

thority that justifies ignoring the district court's valid findings of fact simply because the judge delayed their memorialization. The court's factual findings regarding the political nature of Finance Committee investigator jobs complied with Rule 52(a), and we will reverse those findings only if we are convinced they are clearly erroneous.[2]

The Supreme Court in *Elrod v. Burns* and *Branti v. Finkel* held that firing public employees due to political affiliation violates their First and Fourteenth Amendment rights unless political affiliation is in some sense necessary to their jobs. *Elrod* stressed that a "non-policy-making, nonconfidential" government employee cannot be discharged based solely upon his political beliefs. 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J. concurring). *Branti,* while not rejecting the policymaking and confidential labels, moved toward a functional analysis of whether "party affiliation is an appropriate requirement for the effective performance of the office involved." 445 U.S. at 518, 100 S.Ct. at 1295. This court has opined that "the focus here is on the office or position rather than the individual officeholders." *Meeks v. Grimes,* 779 F.2d 417, 419 (7th Cir.1985). Further, *"Elrod* and *Branti* require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.1985).

In *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), we set out a standard that focuses on the functions of the office:

> The test is whether the *position* held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking where there is room for principled disagreement on goals or their implementation.

*Id.* (emphasis added). We will now apply this functional test to the positions held by appellants, keeping in mind that " '[p]olicymaking' and 'confidential' do accurately describe the vast majority of offices that fall within the realm of legitimate patronage...." *Meeks,* 779 F.2d at 420.

There are two prongs to appellants' argument. First, they say their work was only ministerial and administrative. Hudson, Blackmon, Laschiava and Thomas worked outside the office, gathering information about claims by conducting interviews, taking photographs and obtaining copies of records for processing by the Finance Committee. Valentine worked inside the office, routing outside work to the others and conducting some interviews by telephone. Flowers worked inside the office, processing small property damages claims and sometimes routing requests for more information to Valentine. They contend they were investigators in name only, and had no input into policymaking for the Finance Committee. Second, they argue that Burke did not transform the duties of replacement "investigators" into jobs requiring political loyalty or otherwise meeting the *Elrod-Branti* test. They contend the district court erred by relying exclusively on the job title—"investigator"—to mistakenly conclude that appellants were involved in confidential or policymaking positions.

Appellants then attack the work performed by their replacements as investigators. Within a few months of firing appellants Burke hired the following persons as investigators: William Duggan, Horace Lindsey, Robert Hogan, David McKinney, Alex Obrzut, James Concannon, James Kelleher, Richard Chmelek and James Moore. Burke retained at least four of Frost's investigators—David Balter, LeRoy Keane, Phil Sheridan and Crawford Jacobson. Burke fired then rehired another investigator, Bernard DiMeo.

---

**2.** Because we hold, *infra,* that political affiliation was an appropriate consideration in hiring and firing Finance Committee investigators, we do not reach the alternative holding of the district court that appellants would have been fired for incompetency. If we had reached that issue, we would have been forced to remand to the district court for further findings of fact because Judge Holderman's one-sentence conclusion clearly does not comply with the requirements of Rule 52(a).

Appellants first demonstrate that all the new hires had some political connections to Burke or other influential politicians. (This only stands to reason—Burke does not dispute that he considered these positions political in nature.) Then appellants attempt to show that the replacements did the same claims processing work as appellants, so that Burke did not actually change the role of the investigators.

■ We have already pointed out, however, that we must not focus so much on what appellants or their replacements actually did as on what powers were inherent in the positions they held. *See Tomczak, supra; Meeks, supra.* Some investigators may have exercised all of those powers, others may have performed primarily administrative tasks. Given the intense political divisions affecting the City Council during that period, we hold that the district court was not clearly erroneous to find that "investigators" or "legislative aides" for the Finance Committee provided sufficient subjective input into policy decisions so that political affiliation was an appropriate consideration for hiring and firing.

Partisan politics enter into many decisions of the Finance Committee. That committee, control of which was the subject of so much political infighting, has jurisdiction over many of the City's most important political decisions, including forming the annual budget, proposing bond ordinances, and considering taxes. The committee processes claims against the City, and reviews City contracts and community development block grants. Appellants are correct that the political nature of the Finance Committee is not at issue; nevertheless, the work performed by appellants and their successors contributed to many of the committee's political decisions. As the district court put it:

> These areas are some of the most politically sensitive areas of city government decisionmaking. Finance Committee investigators, consequently, have "inherent" in their position the power to investigate, report facts and have input into those areas of politically sensitive governmental decisionmaking.

Looking first, as appellants do, to the work performed by appellants, we notice immediately that their primary qualifications to work for the Finance Committee—or at least the qualifications all had in common—were their political connections to the former chairman, Alderman Frost. Political affiliation was a primary reason they were hired; all performed political work for Frost and his ward organization. *Hudson v. Burke,* 617 F.Supp. at 1504. The appellants were personally loyal to Frost; Burke testified that during the dispute over the committee chairmanship Frost instructed his staff, including appellants, "not to cooperate with me [or] turn over any documents or records...." As a starting point in considering whether positions are inherently political, the district court certainly was entitled to note that appellants were hired because of their political affiliation.

Appellants try to downplay the work they and their successors performed for the Finance Committee by emphasizing claims processing and dealing with small issues like potholes and street lights. But the Chicago City Council does not normally debate issues of national political consequence. Instead, seemingly inconsequential matters such as potholes and street lights and garbage collection and workmen's compensation claims can be important political issues for the City Council. As Burke testified,

> [p]riorities of expenditures of the City's revenue are political in nature. A decision whether there should be more police or more firemen or more garbage carts or fewer garbage collections or condominium refuse rebates, as opposed to cart pickup programs in various wards— each member of the legislative body ... has a certain agenda that he or she wishes to advance. Sometimes it's for parochial interests, sometimes it's for broader interests.... But to the extent they do advance those individual programs or ideas and ultimately gain approval, I think it's part of the political process....

Appellants provided "meaningful direct [and] indirect input into the decision making process" on these and other political issues where "there [was] room for principled disagreement in the decisions reached. . . ." *Meeks v. Grimes*, 779 F.2d at 420. Appellants might have felt compelled to conduct their inquiries and process claims in a way they thought beneficial to their political benefactor, and harmful to Burke, especially in light of Frost's order that they not cooperate with Burke. The district court was not clearly erroneous in finding that this potential obstruction of the duties of the Finance Committee made political affiliation an appropriate consideration for appellants' jobs.

The appellants believe the district court wrongly relied on the job title of "investigator," while ignoring the actual job responsibilities of those who held investigator positions. But some of Alderman Burke's replacements demonstrate the powers inherent in the position of "investigator" or "legislative aide" for the Finance Committee. No matter what these positions were titled, the evidence showed they were susceptible to partisan political usage, and that Alderman Burke began using some investigators in that fashion after he took over the Finance Committee.

Burke testified that he envisioned an expanded role for committee investigators as the "eyes and ears" of the committee. This role required persons "experienced in gathering information," preferably "with experience in law enforcement, because . . . that is a tremendous training ground for persons who would work as investigators. . . ." Burke's new hires as investigators had substantial experience as retired policemen or detectives, or city and county investigators and inspectors. Burke's assistant testified that 70 percent of his new investigators' time was spent on investigative fact-finding, and only 30 percent on the type of claims processing performed by appellants. Further, Burke sought "people who were dependable and who could be counted upon to respect confidentiality of matters that the Committee would deal with, and who would be loyal to the Office of the Chairman."

The evidence showed that several of Burke's investigators devoted substantial amounts of time to obtaining information used in ongoing Finance Committee and City Council budget battles. In particular, the district court heard evidence that investigators provided politically sensitive information to the Finance Committee that was used to contest positions taken by Burke's political opponents—the administration of Mayor Washington and his allies on the Council—on issues relating to a garbage cart proposal, the appropriate level of police and forestry department manpower, whether a City department abused overtime, the number of industrial inspectors, the need for more ambulances, and budgeting for removal of abandoned buildings, among other things. The investigators also delved into politically sensitive matters such as the abuse of City vehicles and chauffeurs, and inappropriate political channeling of community development block grants.

This investigative work certainly qualifies as "meaningful direct or indirect input into the decision making process" on issues where "there is room for principled disagreement in the decisions reached by the employee and his superiors." *Tomczak*, 765 F.2d at 641. In *Tomczak, id.*, we noted the important political dimensions involved in the provision of city services:

[O]ne of the biggest, if not the biggest, turning points in the 1979 Chicago mayoral election involved the provision of snow-removal services. The primary function of any local governmental entity is the provision of services such as police and fire protection, public schools, hospitals, transportation, and libraries, as well as quasi-utility functions such as water, garbage and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and im-

plementation of plans to achieve that goal.

Appellants concede that two of Burke's investigators, Duggan and Lindsey, engaged in "politically sensitive" work, but argue that

> Duggan and Lindsey were not replacements for any of the plaintiffs. Duggan and Lindsey did not process claims.... [and were] functionally separate from ... the other investigators.... Duggan and Lindsey took their assignments directly from Alderman Burke and had confidential relationships with Alderman Burke.... [They] worked on investigations which were more complicated, and in some instances adverse to the political interests of Mayor Washington's administration.... But the positions held by Duggan and Lindsey have nothing to do with this case because there were other persons who replaced [appellants], and performed the same sort of functions that [appellants] did.

Here appellants state Burke's case. Duggan and Lindsey were two members of a group of persons hired as "investigators" to replace appellants. Burke argues that he changed the role of "investigator" to do more of what Duggan and Lindsey did, and less of what appellants did. It makes no sense for appellants to try to separate Duggan and Lindsey out, admit they performed politically sensitive tasks, and then say they were not replacements for appellants. The evidence showed that some investigators did more fact-finding than others; Duggan and Lindsey were the most experienced and therefore selected for the most politically sensitive and complex investigations, and also spent the most time on investigations as opposed to claims processing. No other members of the Finance Committee staff except "investigators" performed this type of fact-finding. Others on the staff did some claims processing and some fact-finding. But they were all hired as "investigators" to replace appellants. By conceding that some of those investigators performed politically sensitive fact-finding missions for the Committee, the appellants in effect concede that these investigator positions are inherently politi-

cal. The district court's finding is amply supported by the evidence and is not clearly erroneous.

Appellants also challenge the district court's decision to grant summary judgment for the City of Chicago because the City could not be held responsible for the actions of Alderman Burke under a respondeat superior theory. The City's first argument is that appellants were appropriately fired on a political basis from their Finance Committee jobs. In light of our conclusion that Burke's political firing of appellants did not violate their constitutional rights, we need not reach the merits of this issue.

### III. Conclusion

Appellants were political hires whose sponsor lost power. They and their replacements were sources of information for a powerful committee during a time of antagonism and divisive political turmoil; these positions could have been and sometimes were used for political purposes. Political affiliation was an appropriate consideration when they were hired, and was equally appropriate when they were fired. The judgment of the district court is

AFFIRMED.