**John W. SELCH, Plaintiff,**

**v.**

**Christine W. LETTS, in her official capacity as the director of the Indiana Department of Highways; Daniel A. Novreske, in his official capacity as the chief deputy director of the Indiana Department of Highways; Robert D. Boxell, in his official capacity as the**

**chief of the Personnel Services Division of the Indiana Department of Highways; and Frederick Glass, in his official capacity as the Governor's Executive Assistant for Transportation, Defendants.**

**No. IP 89–778–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 3, 1992.

John B. Drummy, Briane M. House, Kightlinger & Gray, Indianapolis, Ind., for plaintiff.

David C. Campbell, Bingham Summers Welsh & Spilman, Indianapolis, Ind., for defendant.

## MEMORANDUM ENTRY FOLLOWING BENCH TRIAL

TINDER, District Judge.

John W. Selch wants his job back. In this lawsuit Selch is seeking to recover his former job with the Indiana Department of Transportation (INDOT) by contending that in 1989 he was illegally fired by the administration of the newly elected Democrat Governor Evan Bayh. Mr. Selch alleges that he was discharged from his position as a subdistrict superintendent with IN-DOT because of his political affiliation with the outgoing Republican party and that this action penalized him merely for being a Republican in violation of his constitutional rights to freedom of speech and association.

After a bench trial in which this Court heard the evidence presented by both parties and after reviewing the law governing this case, this Court now issues findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## FINDINGS OF FACT

This case results from a changing of the guard in Indiana partisan politics. For two uninterrupted decades from 1969 through 1988 Republicans held the Indiana governor's office. In November of 1988 Evan Bayh, a Democrat, broke that twenty year string of Republican gubernatorial victories, promising in his campaign speeches and commercials to end "politics as usual."

John W. Selch was first employed by the Indiana Department of Highways (IDOH)[2] in 1984 as a Highway Engineer Assistant III (HEA III). He was at that time, and remains, affiliated with the Republican political party. Selch concedes his job was acquired through political patronage. In fact, Selch's 1984 application for the HEA III job listed as personal references several prominent members of the Republican party from Selch's home county.

Mr. Selch's employment record prior to joining IDOH is not a testimonial to the value of patronage hiring. From 1950 until August of 1979, Selch was employed by the Chrysler Corporation, eventually being promoted to the supervisory position of Production Control Manager. Selch left Chrysler Corporation after it was discovered that he had committed mail fraud, having personally accepted money from vendors as a bribe to spend Chrysler's money on the vendors' products. Mr. Selch was convicted of mail fraud in federal court in this district in 1982.

After leaving Chrysler in 1979 Selch was employed by the Indiana Bureau of Motor Vehicles ("BMV"). However, in October of 1982 he had to leave the BMV in order to serve his sentence for the federal crime. Nevertheless, except for his criminal

---

1. Should any of this Court's findings of fact be more appropriately called conclusions of law, or vice versa then they should be considered by the reader to support the result reached in this entry regardless of how such findings or conclusions are labeled.

2. When Selch was originally hired into the department, it was referred to as the Indiana Department of Highways (IDOH). Subsequently, under the Bayh Administration, the title of the department was changed to the Indiana Department of Transportation (INDOT). At all times relevant to this case, the essential functions of the department remained the same—the construction and maintenance of highways (including Interstate highways) and secondary roads throughout the State of Indiana.

record[3], there was no evidence presented at trial that indicated that prior to the 1988 election any of Mr. Selch's employer's (Chrysler, BMV, IDOH) was ever dissatisfied with his performance.

The HEA III position acquired by Selch in 1984 required him to perform quality inspections on new road construction within Indiana. While working at this job, Selch received satisfactory reviews from his supervisors.

At the end of 1984 Selch was promoted to the position of Highway Maintenance Supervisor V, also known as the unit foreman position. As a unit foreman, Selch was responsible for supervising a road crew of ten to twelve workers. This road crew was responsible for performing maintenance and repair work on Indiana highways and secondary roads within a small geographic area of the state. In preparation for this job, Selch received training in management and supervision skills from Purdue University, Selch also received on-the-job training regarding the requirements of road maintenance. Selch continued to receive generally favorable performance reviews as a unit foreman.

Selch was appointed to the position of superintendent of the Greencastle subdistrict of the Crawfordsville district of IDOH in July 1986. Selch was promoted by Jack Isenbarger, who at that time was the head of IDOH. The record does not disclose whether considerations of political affiliation entered into the decision to promote Selch, but there is no genuine dispute that the patronage and party "clearance" methods of filling the employment ranks of IDOH continued through this time period.

As superintendent of the Greencastle subdistrict, Selch was responsible for supervising the maintenance of all interstate highways, state highways, bridges, grass medians, ditches, guard rails, rest stops and other highway facilities, and equipment within the subdistrict. Selch supervised approximately sixty employees, including clerical staff, road crews, mechanics and equipment maintenance personnel. He was responsible for planning and scheduling the maintenance work to be performed, overseeing the maintenance crews, inspecting the work to ensure compliance with IDOH's standards, compiling data on work completed, communicating with elected officials within the subdistrict, and acting upon complaints from government officials and the general public regarding the condition of highways within the subdistrict. The subdistrict contained approximately 800 miles of state-maintained roadways and included portions of seven counties (including a portion of Marion County—the most densely populated county in Indiana).

Selch's performance appraisal reports between July 1986 and December 1988 indicated that he was performing his job adequately. During this time he never received less than a satisfactory ranking and received several above average rankings.

As the 1988 gubernatorial election approached Selch apparently became apprehensive about retaining his subdistrict superintendent position. In October of 1988 Selch applied to go back to a unit foreman's job, which would have constituted a demotion. At trial the reason he gave for seeking to return to the lower position was that he wanted to ensure that he would maintain a job in the department if "politics changed." Selch did not receive the requested job reduction.

As Selch feared, Evan Bayh was elected governor in the November election. There was testimony that following Governor Bayh's January 1989 inauguration Selch's job performance slipped. Some district level supervisors felt that his morale was lower than before.

Nevertheless, this criticism was never committed to writing in any personnel evaluation form, nor did the criticism prevent Selch from obtaining a merit pay increase in the spring of 1989 based on his 1988 performance. Moreover, the morale of the entire department was negatively impacted

---

**3.** Evidence of Mr. Selch's conviction was admitted for consideration solely upon the issue of his credibility.

by the change in administrations. Many employees were worried that they might lose their jobs as a result of the change in the party controlling the Governor's office.

During the 1988 gubernatorial campaign, Evan Bayh was critical of IDOH's management practices. Upon assuming office he appointed Christine Letts[4] to be Director of IDOH. After reviewing the department, Letts concluded that it needed to be reorganized. One of Letts' first actions was to change the name of the department to the Indiana Department of Transportation (INDOT).

Also, following soon after his 1988 election, Governor Bayh formed a government operations review committee, composed of a variety of representatives from the private sector. This committee was asked to review all aspects of state government and make recommendations for change. One of the first departments reviewed was the Department of Highways.

One of the review committee's recommendations was the elimination of the general foreman position. The general foreman was a maintenance employee who worked just below the subdistrict superintendent. By shifting the general foreman's responsibilities to the subdistrict superintendent, the committee believed the department would operate more effectively and save the state $1.3 million per year.

Daniel Novreske served as the Deputy Director for Administration of IDOH during the time of Selch's employment, and as such, was familiar with the functions of the subdistrict superintendent. Novreske became Chief Deputy Director for Director Letts after the Bayh administration took over the department, and as early as January 3, 1989 (prior to Bayh's inauguration and during the transition effort), Novreske wrote to a member of Governor-elect Bayh's transition team that "Just as the Director of Highways should be loyal to and share the same philosophy on the operations of state government with the Governor, so too should the Director know that he or she can work with the District Engineers and Superintendents."

In a January 9, 1989, memo from Novreske Letts informed employees of INDOT that she would be "evaluating all district engineer and subdistrict superintendent positions" and would "make a selection from those who are interested and qualified." The memo stated that, "[t]his process will be open to all, both within and outside the Department, and will begin in the very near future. You are welcome to apply for the position." This memo was received by Selch. A brief superintendent job description issued contemporaneously with the memo was not materially different from the old job description under which Selch had been working for nearly two and a half years.

In response to Novreske's memo, Selch submitted his resume and a cover letter dated January 23, 1989. In that letter, Selch expressed his desire to retain or apply for the subdistrict superintendent position which he had held since 1986.

It is interesting to note that Selch listed the Hendricks County Democrat Chairman prominently as his first reference on the resume he submitted. A week later, Selch followed up his application with a letter to Robert Boxell, Chief of the IDOH Personnel Services Division.[5] In his January 30, 1989 letter to Boxell, Selch wrote:

---

4. Letts was chosen from the private sector for leadership of this Department, apparently because of her extensive background and education in business. There is no indication that she was extensively involved in partisan politics prior to her selection as the head of IDOH.

5. Testimony regarding the Bayh administration's employment of Boxell for a brief juncture in the critical personnel position in INDOT provided an interesting sidelight into both Indiana political history and the hiring and firing procedures employed by the newly elected Bayh administration. Moreover, this information is relevant to this Court's ultimate finding that the firing of John Selch was politically motivated.

Robert Boxell's involvement in the allocation of political lucre has transcended decades of partisan political history in Indiana. In the early 1960's, Boxell became acquainted with a talented young man named Birch Bayh who served in the Indiana Legislature as its Speaker. When Speaker Bayh eventually became United States Senator Bayh, Boxell joined the Senator's staff as a special assistant. After approximately six years in that capacity, Boxell returned to the

"Further, I would bring to your attention the references I have listed in my resume, for your contact relative to my character and/or performance in areas of specific responsibilities. These references are twofold in purpose, both from a management approach and personnel I was responsible to. Other references pertain to the general public satisfaction in progressive management philosophies in continued highway maintenance to their needs and satisfaction."

Initially, Selch's resume was the only application received by INDOT for the Greencastle superintendent position. Thereupon Governor Bayh's Executive Assistant, Fred Glass, contacted Greencastle resident Susie Harmless in May 1989. Mrs. Harmless was Vice Chairwoman of the Putnam County Democrat Party and a member of the Judicial Nominating Commission for the State of Indiana. She is also the wife of the Democrat Mayor of Greencastle, Indiana. Mr. Glass testified that the names of three additional applicants for the Greencastle superintendent position were provided by Mrs. Harmless and that these names had been given to her by her husband and by the Chairman of the Putnam County Democrat Party. Other Democrat party officers and local elected officials were contacted as well regarding the Greencastle superintendent position.

One of the names provided by Mrs. Harmless was that of William Sibbitt. Like Mr. Selch in 1984, in May of 1989 Mr. Sibbitt had had no prior highway or road maintenance experience. Mr. Sibbitt, however, was and still is a member of the Democrat Party. Indeed, Sibbitt was informed about the job opening and applied for the position through his Democrat party connections. Mr. Sibbitt was eventually hired to fill the subdistrict superintendent position.

Christine Letts testified that although she received input from Robert Boxell, the Chief of INDOT's Personnel Services Division, her deputy directors and the district managers, she made the ultimate decisions regarding the hiring and firing of subdistrict superintendents. Eventually all 37 subdistrict superintendents who were carry-overs from the previous administration were fired by Letts.

On June 6, 1989, Selch received a letter from Darryl Huyett, the district manager for the Crawfordsville district. The letter advised Selch that he would not be retained as the superintendent at the Greencastle subdistrict and that his employment with INDOT would be terminated effective June 23, 1989.

Selch was offered two lower level positions within INDOT. The first position was as a laborer on a road crew. The second position was the quality inspection job that Selch held when he first joined the department—Highway Engineer Assistant III. Selch refused both offers.

The slight evidence of any on-the-job shortcomings of Selch, the evidence that Mr. Boxell, an individual steeped in the ways of patronage with little or no formal experience in personnel, was the primary individual charged with evaluating the subdistrict superintendents, the documentary evidence reflecting that Boxell focused on political affiliation in evaluating the per-

private sector where he maintained and utilized his political contacts.

Senator Bayh's son, Evan, is the "Governor Bayh" referred to throughout this entry. Interestingly, Boxell was selected to be the first personnel director of INDOT not by Commissioner Letts but directly by Governor Bayh's office. Boxell's selection to the INDOT personnel post was made shortly after he met with a key aide of the Governor-elect, William Moreau.

Boxell had no significant personnel experience prior to his stint with INDOT. However, because of his decades of experience in the wars of partisan politics in Indiana, if Boxell did not personally know the political affiliation of all of the incumbent subdistrict superintendents and candidates, he knew how to learn that information from others through simple telephone calls. Thus, it was not necessary to require the incumbents or candidates to declare their political affiliation. Plaintiff introduced Boxell's notes which contained "R" and "D" notations next to the names of candidates for subdistrict superintendent positions.

After a short stint at INDOT, Boxell was moved to the Indiana Bureau of Motor Vehicles, another state agency that was being restructured pursuant to promises made by candidate Bayh during the 1988 campaign.

formance of subdistrict superintendents, the curious coincidence that all 37 out of 37 Republican subdistrict superintendents were fired, and the complete lack of relevant job experience possessed by Selch's successor lead this Court to the conclusion that Selch was terminated for partisan political reasons.

During the period of Selch's employment, IDOH (later INDOT) was the largest department within Indiana state government, employing approximately 6,000 workers. This department was responsible for planning, constructing, and maintaining the highway and road system within the State of Indiana. In order to maintain the State's roads, IDOH divided Indiana into six geographical districts, which were further divided into 37 subdistricts. Each subdistrict was run by a superintendent. The entire department was supervised by the central office, which is located in Indianapolis.

Since Selch's firing, the position of subdistrict superintendent has undergone some minor changes. INDOT requested that the Department of Personnel reclassify the superintendent position to a PAT I level position (PAT is an acronym for "professional and technical"), entitled Highway Subdistrict Manager I. In support of its request for reclassification, INDOT included a new organizational chart which showed that the general foreman position had been consolidated into the Highway Subdistrict Manager I position. INDOT also included a new job description for the Highway Subdistrict Manager I position.

The new job description, however, was not materially different from the old job description of the subdistrict superintendent position. A comparison of the different job descriptions submitted at trial and a comparison of Selch's and Sibbitt's testimony regarding their jobs reveals few changes between the old subdistrict superintendent position and the new highway subdistrict manager position.

Perhaps the most significant change between the old subdistrict superintendent

position and the new one is that base pay has gone up. As a result of the reclassification, Highway Subdistrict Manager I's [6] received a base salary increase (from $22,828 to $25,688), but were no longer eligible for overtime pay.

Letts also testified that she adopted a "power down" theory of management, in which the objective was for power and authority to be pushed down to the lowest level employee capable of handling the responsibility. As part of this power down management philosophy, Letts believed that the position of subdistrict superintendent should become a more powerful job within INDOT. Nevertheless, this power down theory of management appears to have had little impact on the job responsibilities of subdistrict superintendents. Subdistrict superintendents already wielded considerable discretion prior to the change in administrations.

During Selch's tenure with the highway department, guidance for the subdistrict superintendent's job was provided by IDOH's Maintenance Management System (MMS). The goal of this system was to promote uniform planning, consistent and effective scheduling, and proper performance of road maintenance throughout the state.

The basic concepts and the specific procedures underlying the MMS were contained within an inch thick manual published by IDOH, entitled "Field Operations Manual." This manual was prepared by IDOH's central office and was heavily relied upon by the subdistrict superintendents, including Selch.

The MMS provided Selch with a detailed computer printout of the "inventory" within his subdistrict for which he was responsible. This printout listed such items as the miles of highway within the subdistrict, the miles of highway lanes, the miles of paint stripe, miles of curb, feet of guardrail, the swath miles of median grass (a swath mile is an area of grass one mile long and the width of the lawn mower), and

6. For simplicity, the Highway Subdistrict Manager I position will be referred to by its original title—the subdistrict superintendent position—throughout the remainder of this opinion.

the number of bridges, signs, lights, rest stops, and weigh stations within the subdistrict. In short, the MMS printout listed all the items within the subdistrict that IDOH was responsible for maintaining and was used in conjunction with the field operations manual to plan and schedule all routine maintenance work.

The manual set forth the various work activities that were to be performed by the maintenance crews for each inventory item on the MMS printout. For example, the manual listed a dozen work activities for roadway and shoulder maintenance. Bridge maintenance involved five work activities. Nine work activities were listed under roadside maintenance. The manual also set forward those work activities that could be authorized at the subdistrict level and those that could be authorized only at the district level.

For each work activity, the manual also established performance standards. A typical performance standard set out the approximate number of workers needed to perform the work activity, the type and quantity of materials needed, the equipment needed, a description of the work to be done, an estimate of the average daily production (a measure of the amount of work that the recommended crew size could accomplish within an eight hour day), and the level of authorization required for the work (subdistrict or district).

IDOH exercised control over maintenance work through the use of computer "crew day" cards. Each card represented one eight hour day of a particular work activity using a standard crew size, equipment and materials. The crew day cards were color-coded to reflect the varying importance of specific work activities. Work crews were not permitted to perform any work unless it had been authorized through the issuance of a crew day card. These cards were prepared by IDOH's central office and sent to the district offices.

The district office retained control over those crew day cards that represented work activities requiring district level approval, the rest of the cards were sent down to the subdistrict superintendents, who retained control over those crew day cards that represented work activities the superintendents could authorize.

Using the inventory lists for each subdistrict, IDOH's central office every year coordinated the preparation of a maintenance work calendar for each subdistrict. For every month of the year, this calendar listed the different number and types of work activities that should be performed within the subdistrict. Crew day cards were printed every year based on the work projected on the maintenance work calendar. For example, if the maintenance work calendar projected that the Greencastle subdistrict would need to commit five crew days to sealing cracks in the month of June, then five crew day cards were printed to authorize this work.

It was the subdistrict superintendent's responsibility to prepare a semi-monthly schedule of work to be performed. To prepare this schedule, the superintendent relied on the maintenance work calendar, on "maintenance needed" reports completed by his subordinates, and on complaints from the public, including complaints coming from public officials such as mayors, county commissioners and state legislators.

The semi-monthly schedule contained a description of work activities to be performed, locations for the work, and an estimate of the number of workers and days required to complete the work activities. A copy of the semi-monthly schedule was forwarded to the district level for review. Based on the semi-monthly schedule, the appropriate crew day cards were distributed to the work crews on a daily basis by the unit foremen.

The subdistrict superintendent had the authority to designate on the card where the crew was to work. For example, if the work activity designated by the crew day card was shallow patching, the superintendent would designate which stretch of road in the district was to be patched that day. Since the district level managers made only occasional inspections of the roads within the subdistrict, the authority to direct work to certain roads provided the subdistrict superintendent with a great

deal of discretion respecting the maintenance of the highway system within the subdistrict.

Through the issuance of the crew day cards, the work crews knew what work activity to perform, where to do it, how many workers were required, and the materials and equipment needed. At the end of the day a crew would record on the crew day card the amount of work completed, the hours spent, the materials and equipment used, and the employees who performed the work. The card was then returned to a clerk at the subdistrict office. The clerk verified the accuracy and completeness of the cards, and compiled the information contained on them into a report that was forwarded to the district level.

The tools used by the superintendents to monitor the maintenance schedule included monthly maintenance activity summaries (which compared the amount of work completed with the amount of work planned), and field inspections.

The job description under which Selch worked contained a number of references to ministerial functions that related to duties controlled in large part by the MMS program. However, among many other duties, the description required that the subdistrict superintendent:

—investigates and takes corrective action on complaints and information requests from the general public;

—provides personal supervision, personnel, and equipment during emergencies, such as snow and ice removal, detours, accidents, and road repairs, etc.;

—consults with subordinate personnel providing coordination and direction on

the repair and maintenance of state roads and highways;

The description also identified as an important skill the "ability to effectively communicate with district and subdistrict personnel, contractors, other governmental officials, and the general public." In essence, all of these skills and duties were carried forward into the amended job description devised under the Bayh administration.[7]

As Selch viewed his job, he perceived that he was principally responsible for merely a rote application of the work formula and allocation of projects as directed by the MMS. However, a more critical review discloses that the subdistrict superintendent had a broad range of duties that required skills in receiving and acting on public complaints[8], judgment in the evaluation and prioritization of maintenance work and the ability to react to different problems arising from weather and road conditions, traffic emergencies and related matters. The extensive breadth of the responsibilities accompanying the subdistrict superintendent position was demonstrated both in the subdistrict superintendents' job description and through the testimony of others who were familiar with the responsibilities of the superintendent, both before and during the Bayh/Letts administration.

George Schoner, began working as Deputy Commissioner for Operations at INDOT in the Bayh administration in April of 1989, shortly before Selch was terminated. Shortly after his arrival at the department, the INDOT reorganization took place. Authority over the 37 subdistrict superintendents is within Schoner's area of Operations. Schoner viewed the subdistrict superintendents as the front line of the department and he relied upon them to react immediately to any road conditions that might affect travel. He emphasized that subdis-

---

**7.** The amended job description is largely irrelevant to the issues in this case as it was not developed until some months after Selch was terminated. What is relevant are the functions and responsibilities of and the discretion exercised by the subdistrict superintendents at the time Selch was terminated.

**8.** As many as fifteen to twenty telephone calls per day were received by each subdistrict within the state. Many of these calls were complaints lodged by state legislators who lived or worked within the subdistrict or who represented voters who did.

trict superintendents had to be innovative and flexible in approaching emergency duties and specifically recounted the department's response to a recent tornado.

Schoner also described the superintendent's position as a "customer focus" job and noted that a specific responsibility of the job was to foster "good public relations" in the geographic area of the subdistrict. Schoner discussed the importance of citizen complaints that are routinely received and resolved at the subdistrict level and pointed out that these complaints constantly require the superintendent to make ongoing decisions about road maintenance priorities. Schoner acknowledged that each of the subdistrict superintendents faces different problems because of differences in geography, road surfaces, population base and other factors.

Not surprisingly, the testimony of William Sibbitt, Selch's successor as subdistrict superintendent, paralleled Schoner's. Sibbitt confirmed that he is in contact virtually daily with members of the public, including mayors, county commissioners and state legislators about conditions of the roadways in his subdistrict. Moreover, in contrast to Selch's testimony, Sibbitt did not feel that his work was limited to simple applications of the MMS. In fact, he indicated that he was only required to refer to the MMS about every three or four months. He described the MMS as nothing more than a general guideline, and indicated that the day-to-day activities of the subdistrict were dictated largely by the emergencies and other situations routinely facing the subdistrict personnel. This Court finds that Sibbitt's explanation of his job functions was more credible than Selch's description.

Darryl Huyett, a degreed civil engineer employed for over 18 years by IDOH, worked as an area engineer during the Selch's tenure with IDOH and continued with the Department in the Bayh/Letts administration. By virtue of his position Huyett was familiar with the duties of the subdistrict superintendents. Huyett confirmed that the superintendents were required to make priorities for road mainte-nance within the subdistrict and that the superintendent's role in the budget process was substantial because of his familiarity with the conditions, equipment and manpower in the subdistrict. He noted that snow removal alone accounted for approximately one million dollars a year per subdistrict.

When questioned about the budget process, Huyett pointed out that a sterile compilation of historical data was just part of the evaluation process. In his view, the superintendent's particularized input regarding subdistrict needs was essential because historical data does not account for many conditions of which only the superintendent is likely to be aware. As he put it:

Yes, but things change. There are storms in between. Some years we have more snow than others. Some years we need to put more pipes in than others because of floods. Maybe ditches fill up, so some years we may have more ditching than others.

So yes, we have historical data for a guide, but again we need that input (the superintendent's) for an up-to-date program.

Huyett also corroborated the testimony of Schoner and Sibbitt that the superintendent's job entailed a significant public relations aspect.

Larry Vaughn served as District Maintenance Engineer (formerly titled Assistant District Maintenance Engineer) for the Crawfordsville district, which included the Greencastle subdistrict, during Selch's tenure, and he was retained in that position during the Bayh/Letts administration. He was the direct supervisor for all subdistrict superintendents in the district, including Selch. Vaughn described at length the manner in which the MMS was and is utilized in the operation of the subdistricts. He also confirmed that the operation of the subdistricts after the Bayh/Letts reorganization is not substantially different than the previous operation.

Vaughn testified that even under the prior administration, Selch was required to make independent decisions, albeit within certain policy guidelines. Vaughn con-

sidered many aspects of the "power down" concept to have already been in place prior to the change in administrations. Vaughn also emphasized the significant public relations aspect of the superintendent's job and that the job involves a great deal more than just a simple application of formulas provided by the MMS. As Vaughn put it: "Obviously someone from the district office can't be there all the time; someone from the central office isn't there all the time, and there's got to be somebody there that can make decisions."

To put it in simple terms, John Selch was the IDOH to the vast majority of the people who lived, worked and passed through the Greencastle subdistrict on state highways and roads. Selch was the point man who handled phone calls and complaints from the public and elected officials.

Moreover, as a subdistrict superintendent Selch possessed substantial discretionary authority. Although the MMS prescribed techniques for performing maintenance functions such as chuckhole patching and snow removal, and classified the roads—with Interstate highways having the highest priority and the least travelled roads having the lowest priority—the subdistrict superintendent alone had (and still has) the final say-so as to which portion of any road is patched or plowed first, and as to when the primary roads are adequately maintained so that the secondary roads can be plowed or patched. The superintendent's response to the public's demand for those services is undoubtedly the single most important factor in determining how INDOT is regarded by the largest part of the populace in each subdistrict.[9]

The subdistrict superintendent's input into the preparation of future budgets was also essential. The superintendent provided information and analysis to the district level managers who submitted budget estimates to the central office. In doing so, the superintendent relied heavily on historical data regarding the types of work that were required in the previous years, and the hours and equipment required to perform this work. However, the subdistrict superintendent was also required to consider the current conditions of the roadways and equipment in the subdistrict as well as the efficiency and capability of the workers assigned to the subdistrict. By virtue of his responsibilities in the field the subdistrict superintendent acquired information otherwise inaccessible to the district managers. Thus, while final responsibility for preparing future budgets lay with the central office, the subdistrict superintendent's day to day observations within his/her area afforded the subdistrict superintendent the opportunity to channel critical information into the budgetary process.

### CONCLUSIONS OF LAW

The parameters that must guide this Court's decision emanate from *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).[10] In *Elrod* a sharply divided Court held that the First Amendment afforded public employees a right to be free from politically motivated firings. Nevertheless, while *Branti* and *Rutan* have given some contour to the right of government employees to be free from politically motivated employment decisions, the proposition that this Court's task has been firmly prescribed is a fiction. The application of the principles discussed in

---

**9.** In contrast to their authority over the timing and location of roadwork, subdistrict superintendents had relatively minor purchasing authority. In order to purchase equipment with a price tag over $1,500, the superintendent was required to submit a written request for the purchase to his district level supervisor. Moreover, superintendents were not permitted to sell equipment. Also, all contracts were negotiated by IDOH's central office.

**10.** Page cite numbers are not yet available in the official United States Reports for the *Rutan* case. Accordingly, citations to *Rutan* in this entry are to pages in the Supreme Court Reporter.

the *Elrod, Branti, Rutan* trilogy to the facts of specific cases has been more art than science.[11]

The difficulty in achieving a consistent application of the broad strokes of the *Elrod–Branti* line of cases is a reflection both of the imprecise language used by the Court and of the myriad different contexts in which the political firing standard has been interposed.[12] The makings of this difficulty were apparent from the start[13], and, over a decade of jurisprudence later, the proper application of the standard to any new set of facts remains enshrouded in the mists of judicial unpredictability. This fog shows few signs of lifting.[14]

Moreover, the Seventh Circuit, no less than any other lower court, has had little luck in shining appreciably more light on the subject. *Compare Upton v. Thompson*, 930 F.2d 1209, 1215, 1218 (7th Cir. 1991) (speculating with little factual analysis that "a Sheriff's core group of advisers will likely include his deputies" and holding (presumably as a matter of law)[15] that, "a

sheriff may use political considerations when determining who will serve as deputy sheriff") *with Lohorn v. Michal*, 913 F.2d 327, 334–35 (7th Cir.1990) (holding that fact that statute described the "Assistant Chief of Police" as a "policymaking" official and fact that statute did not place express limits on "the powers of the office" of the Assistant Chief of Police were insufficient to make the official a policymaker as a matter of law) or *compare Matlock v. Barnes*, 932 F.2d 658, 664–65 (7th Cir.1991) (jury found that political affiliation *was not* appropriate criteria for discharge of investigator for city legal department), *cert. denied,* —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991), *with Hudson v. Burke*, 913 F.2d 427, 434 (7th Cir.1990) (jury found that political affiliation *was* appropriate criteria for discharge of investigator for city finance committee). Accordingly, this Court approaches the opportunity to apply the *Elrod–Branti* standards to a new set of facts with all the relish of a sojourner forced down a darkened alley on a moonless night.

---

**11.** The undulations of the case law attest to the fluidity of the standard the district courts have been given to apply. *See, e.g., Rutan*, 110 S.Ct. at 2756–57 (Scalia, J. dissenting) (collecting contradictory applications of the *Elrod–Branti* standard); *Stott v. Haworth*, 916 F.2d 134, 144–45 (4th Cir.1990) (collecting cases from "various jurisdictions" to illustrate the "seemingly inconsistent and unpredictable results" produced by the "application of *Elrod–Branti*"). Moreover, this Court has previously observed that the Supreme Court's adoption of what is essentially a standardless approach to political firing cases has made the summary judgment process inapplicable in many such cases while at the same time turning the defense of qualified immunity into a defense of virtual absolute immunity. *See Felton v. Bd. of Comm'rs of Greene County*, 796 F.Supp. 371, 375–76, 380 (S.D.Ind.1991).

**12.** In *Meeks v. Grimes*, 779 F.2d 417, 419 (7th Cir.1985), the Seventh Circuit observed that, "the problems faced by the courts in applying the formulation have become increasingly intractable. This is the natural product of the fact that, not only do job classifications and personalities vary in each case, but also there are substantial differences between governmental bodies and between individual departments or units within a given governmental body."

**13.** *See, e.g., Branti*, 445 U.S. at 524, 100 S.Ct. at 1297 (Powell, J., dissenting) ("[t]he standard articulated by the Court is framed in vague and sweeping language certain to create vast uncertainty").

**14.** Based on the decisional record in *Elrod, Branti* and *Rutan* there is not a clear majority on the Court in favor of reversing the current tide. However, at least four Justices have expressed a predisposition toward dispensing with the current line of political firing cases, *see, Rutan*, 110 S.Ct. at 2746, 2749–59 (Scalia, J., dissenting, joined by Rehnquist, C.J., Kennedy, J., O'Connor, J.). Thus, the positions on these issues taken by Justice Souter (replacing Justice Brennan) and by Justice Thomas (replacing Justice Marshall) may be critical to the continued vitality of this area of constitutional adjudication.

**15.** In *Thulen v. Bausman*, 938 F.2d 84 (7th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), four judges dissented from the court's denial of a petition for rehearing en banc of the *Upton* decision. Those judges objected that the part of the panel opinion in *Upton* that reached the question of whether a deputy sheriff is protected by the first amendment's prohibition on political hirings was an ill-advised, "sweeping advisory opinion . . . so sweeping, its scope is . . . unclear." *Thulen*, 938 F.2d at 85.

What is as clear as writing on a wall [16] is that once a plaintiff has proved that he was fired, not hired, not promoted, transferred, not recalled or demoted [17] and that politics was a motivating factor in the government's adverse employment action "the ultimate inquiry is ... whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Upton*, 930 F.2d at 1214 (*quoting Branti*, 445 U.S. at 518, 100 S.Ct. at 1295). If such a demonstration cannot be made by the defendant the discharge, demotion or failure to hire violates the First Amendment and damages or an injunction is generally appropriate unless the defendant can show that the plaintiff would have been fired, not hired, or demoted anyway even without the improper motive.

■ Neither party in this case argued that Mr. Selch was not fired. Indeed, Mr. Huyett, the district manager over Mr. Selch, referred quite unequivocally in his letter to Mr. Selch to "[t]his ... notice of termination of employment with the department." Accordingly, this Court's analysis focuses principally on two questions: (1) whether politics was a motivating factor in the decision to terminate Mr. Selch [18] and (2) whether political affiliation was an appropriate requirement for the effective performance of a subdistrict supervisor in the Indiana Department of Highways.

1. *The evidence is clear that politics was a motivating factor in Mr. Selch's discharge.*

This Court concludes that Mr. Selch has proven by a preponderance of the evidence that politics was a substantial motivating factor behind his firing. Mr. Selch has established that he was a member of the Republican party at all relevant times and that those responsible for firing him were aware of his affiliation.

The fact that the Bayh/Letts administration fired all 37 incumbent subdistrict superintendents within a few months after taking office strongly suggests that politics played a substantial role in those termination decisions. After all, even a "political eunuch" [19] would know that political purges of this magnitude are difficult to explain away on innocent grounds. *Cf. Meeks,* 779 F.2d at 418 (newly elected Gary, Indiana city court judge's firing, on the same day judge was sworn into office, of all the court's bailiffs who had worked for the election of the judge's primary opponent led to inference that politics was substantial factor in the decision to fire); *Lindahl v. Bartolomei*, 618 F.Supp. 981, 987 (N.D.Ind.1985) (Easterbrook, J., sitting by designation) ("a political firing need not be a purge to be unlawful").

In addition, this Court is persuaded by admissions made by representatives of the Bayh Administration. Fred Glass, the Governor's Executive Assistant for Transportation, admitted that politics was one of several factors considered in filling the 37 subdistrict superintendent positions. Glass also revealed that key members of the Democrat party throughout the state were solicited to provide the names and resumes of persons who would be suitable for the superintendent position. Although it is possible that these political sources could have provided INDOT with applicants who had the education and experience needed to qualify for this position, the defendants' claim that they sought out the most qualified applicants rang hollow when Glass revealed in court that he made no effort to

---

**16.** Of course, while the writing may be clearly visible, it is in the interpretation of the writing that has always laid the rub.

**17.** *See Rutan,* 110 S.Ct. at 2739 (holding that "the rule of *Elrod* and *Branti* extends to promotion, transfer, recall, and hiring decisions based on party affiliation and support"). It takes no stretch of logic to apply *Rutan*'s extension to demotions as well.

**18.** In this case the defendant's argument that politics was not a motivating factor in Mr. Selch's discharge collapses into its argument that Mr. Selch would have been fired anyway regardless of politics, thus the subject of the neutral reasons given by the defendant for Mr. Selch's termination is not revisited as a separate line of inquiry in this opinion.

**19.** *See In the Matter of Mason,* 916 F.2d 384, 387 (7th Cir.1990).

contact those entities most likely to be in touch with those who were most experienced in the construction industry—construction companies, trade associations, and road contractors. It is common to infer on the basis of an employer's pretextual or suspicious reason for a termination that the employee was terminated for an improper reason. *See Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 18 n. 7 (7th Cir.1987) (citation omitted).

Testimony at trial also revealed that Robert Boxell, INDOT's personnel director, maintained a list of applicants for the subdistrict superintendent positions. Boxell had placed the "scarlet letter" "R" next to the names of some of the Republican applicants on this list. Although there was evidence that more than a cursory review of the experience and abilities of the former subdistrict superintendents was made before these thirty seven individuals were fired, a significant emphasis was placed on party affiliation during the review.[20] These facts lead this Court to conclude that Selch's status as a Republican was a substantial factor in Letts' decision to fire him.

■ Defendants' argument that there was a sufficient independent reason for Mr. Selch's discharge is based entirely on defendants' limited evidence that the plaintiff had morale and performance problems in the first five months of 1989. Although this evidence is relevant on the ultimate question of the cause of the firing, it does not undermine this Court's conclusion that politics played a significant role in the firing decision.[21] Nor does this evidence undercut this Court's conclusion that there was not a sufficient independent justification for Selch's discharge. Defendants' evidence is simply not up to the role defendants would have it play.

The defendants' evidence that Selch's job performance had slipped came from INDOT employees who were carried over from the preceding Republican administration and from some of the new members of the Bayh/Letts management team. However, on cross examination of these witnesses, plaintiff's counsel brought out the fact that the entire morale of the department was down in the first half of 1989 as a result of widespread apprehension over job security. The entire department, however, was not discharged. The defendants' failed to describe what was unique about Mr. Selch's alleged slip in morale that justified his termination.

Moreover, the verbal assertions that Selch's performance had slipped do not weigh heavily in the balance of this case, especially because the defendants can point to no written evaluation of the plaintiff to substantiate their charge. On the contrary, all of Selch's written evaluations reflect that he was performing his job in an adequate manner. Also, in March of 1989, in the middle of his alleged slump, Selch received a merit increase in salary. Nonetheless, the evidence would support a conclusion that Selch appeared to be more concerned with his own job security than he was in truly furthering the goals of the incoming administration in his subdistrict. His own testimony left this Court with that impression. However, the evidence did not persuade this Court that Selch's day-to-day job performance became deficient. *Cf. Sands v. Starke Co. Bd. of Comm'rs*, 530 F.Supp. 712, 714 (N.D.Ind.1982) (where defendants' evidence showed numerous specific examples of deficiencies in plaintiff's performance, court concluded that plaintiff would have been fired from her job even if she had not engaged in protected conduct). Accordingly, this Court holds that Selch was fired for a politically motivated reason and now turns to the question of whether politics was an appropriate requirement for the office of highway subdistrict superintendent.

---

**20.** For example, Boxell forwarded comments about the incumbent superintendents to Commissioner Letts. Included among these comments were remarks describing some incumbents as "totally political," "very political," "strong politically" and "strong political ties."

**21.** The plaintiff bore the burden of proving only that politics was a substantial factor behind his firing. He did not have to prove it was the only factor. *See, e.g., Nekolny v. Painter*, 653 F.2d 1164, 1167 (7th Cir.1981), *cert. denied* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

## 2. Political affiliation is an appropriate job qualification for the position of highway subdistrict superintendent.

In *Elrod* the Supreme Court held for the first time that patronage dismissals were in large part circumscribed by the First Amendment. "The cost of the practice of patronage," said Justice Brennan, "is the restraint it places on freedoms of belief and association." *Elrod*, 427 U.S. at 355, 96 S.Ct. at 2680–81. "An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job." *Id.*[22]

Jobs may still be legitimately lost to patronage however. Patronage hiring or firing may be practiced if political affiliation "is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295. The theoretical basis for this exception to the rule against patronage is the role that political affiliation and party loyalty are said to play in securing a representative government.

It has also been argued that patronage can play a part in making government more efficient. In *Branti* Justice Stevens said that, "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517, 100 S.Ct. at 1294 (*citing Elrod*, 427 U.S. at 366, 96 S.Ct. at 2686).

Nevertheless, Justice Brennan's prior plurality opinion in *Elrod* had, in fact, "rejected … government effectiveness and efficiency" as a rationale for patronage dismissals. *Elrod*, 427 U.S. at 366, 96 S.Ct. at 2686. Instead, Justice Brennan found that the only legitimate justification that could save some aspects of patronage from constitutional infirmity was

> the need for political loyalty of employees, *not to the end that effectiveness and efficiency be insured,* but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.

*Id.* at 367, 96 S.Ct. at 2687 (emphasis added).

■ In *Rutan* Justice Brennan was to have the last word. *See Rutan*, 110 S.Ct. at 2734 ("the government can ensure employee effectiveness and efficiency through the less drastic means of discharging staff members whose work is inadequate"). So, at least for now, the only constitutionally acceptable basis for patronage is "the end that representative government not be undercut." *Elrod*, 427 U.S. at 366, 96 S.Ct. at 2686.[23] Permissible patronage dismissals typically involve "confidential" and "policymaking" positions[24] because "[n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687.[25]

**22.** The concept that patronage in practice actually infringes upon the zone of interest the first amendment was designed to protect has been hotly disputed. *See Rutan*, 110 S.Ct. at 2746–58 (Scalia, J., dissenting). Of course, that battle is not this court's to join.

**23.** This Court believes that keeping in mind the role patronage plays in contributing to a representative government can shed some light on whether a given act of patronage passes constitutional muster.

**24.** *See Meeks*, 779 F.2d at 420 (" '[p]olicymaking' and 'confidential' do accurately describe the vast majority of offices that fall within the realm of legitimate patronage under the *Branti* formulation").

**25.** "Policymaker" or "confidential" do not describe all the positions in the realm of legitimate patronage. For as the Court has said, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295. While this Court has applied the *Branti* formulation to decide this case, at the same time, this Court finds it helpful to use the term "policymaker" as shorthand to characterize those who may appropriately be discharged for political reasons.

Defendants contend that they could fire Mr. Selch with impunity because he occupied a policymaking position. In *Elrod* Justice Brennan articulated several criteria to be considered by courts when drawing the line between policymakers and nonpolicymakers. First, Brennan noted that the line ought to be drawn so that those who are "not in a position to thwart the goals of the in-party" are not penalized for being a member of the out-party. *Id.* at 367, 96 S.Ct. at 2687.

■ Second, Brennan emphasized that the responsibility exercised by a public employee was a key factor in determining that employee's status as a policymaker. Brennan noted that employees with only limited responsibility are not typically policymakers. Nevertheless, he noted that even an employee "with a number of responsibilities is [not] necessarily in a policymaking position." *Id.* Rather, it is the *nature* of the responsibilities that is "critical." *Id.* Responsibilities that are ill-defined or broad in scope are indicative of a policymaking position. Well-defined or limited responsibilities suggest a nonpolicymaking position. *Id.* at 368, 96 S.Ct. at 2687.

After *Branti* "confidential" and "policymaking" employees are clearly not the only legitimate targets of patronage dismissals. However, *Branti* also made clear that there are at least some "policymaking" positions for which "party affiliation is [not] an appropriate requirement."[26] *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

It may also be noted that to the background of criteria, considerations, and suggestions inherited from the Supreme Court the Seventh Circuit has added the gloss that a job that may be filled by patronage where "the position ... authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny,* 653 F.2d at 1170. There are many instances where the Seventh Cir-

cuit's reformulation has proven particularly helpful, however, this Court has not found that this is one of those instances.

At least in terms of Mr. Selch's communications with his superiors, it would be a stretch to say that his job entailed "meaningful input into government decisionmaking." *Id.* Except for the information he supplied in conjunction with the budgeting process, there was little evidence that he was relied upon to provide critical information or other "input" to the hierarchy of the highway department. Moreover, if the term "goals" is broadly construed, there was little room for principled disagreement over Mr. Selch's goals. Broadly put, Mr. Selch's goal was simply to insure that the road construction and maintenance work in his subdistrict was effectively and speedily undertaken. *But cf. Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.1985) (holding that the plaintiff was a policymaker because "[w]hile the ultimate goal of all sides might be the same, there [was] clearly room for principled disagreement in the development and implementation of plans to achieve that goal"), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).

Nevertheless, this Court cannot leap to the conclusion that political affiliation was not an appropriate criteria for the effective performance of Mr. Selch's job. As the Seventh Circuit has cautioned: "[a] narrow definition of who is a policymaker necessarily increases the chances of 'undercut[ting] ... the implementation of the policies of the new administration, policies presumably sanctioned by the electorate.'" *Nekolny,* 653 F.2d at 1169–70 (*quoting Elrod,* 427 U.S. at 367, 96 S.Ct. at 2687). Moreover, emanating from the indefinite and sometimes conflicting brew of considerations offered by Justice Brennan in the *Elrod* case, this Court detects two lines of inquiry that are relevant to a consideration of the constitutional propriety of dis-

---

**26.** The example given by the Court was a football coach at a state university who, while he may "formulate" policy, falls within the scope of the protection afforded by the First Amendment

because "no one could seriously claim that Republicans make better coaches than Democrats." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

charging Mr. Selch for his politics.[27] These lines of inquiry may be formulated as questions:

(a) Did Mr. Selch's job require the exercise of a significant level of responsibility?

(b) Did Mr. Selch's job place him in a position in which he could seriously threaten the goals of the in-party?

This Court answers both of the above questions in the affirmative and, accordingly, holds that Mr. Selch could be constitutionally displaced from his job as a subdistrict superintendent in the state highway department merely on the basis of his affiliation with the Republican Party.

a. The position of subdistrict superintendent required the exercise of a significant degree of responsibility.

Even where the exercise of a significant degree of responsibility does not reflect policymaking status, the level of responsibility exercised by an employee can put that employee in a position to strongly impact the success or failure of an administration's programs. That is true because "in implementing [a] basic policy, [an employee] will 'make some decisions that will actually create policy.'" *Upton*, 930 F.2d at 1215 (citation omitted). Even where an employee's job responsibilities are strictly circumscribed, in today's complex and information-intensive working world it is quite difficult to avoid a situation in which an employee exercises at least some discretion. Of course, the amount of discretion exercised by an employee increases in importance to the employer when the potential impact of that discretion is multiplied by a significant degree of responsibility also exercised by that employee.

Both the amount of discretion and the level of responsibility exercised by an employee must be considered together to fully understand the sphere of power and authority wielded by that employee. However, while job responsibilities are often listed in a job description, a contract or a statute and are typically commonly understood, discretion is often a subtle and difficult thing to measure.

Nevertheless, the difficulty of quantifying the amount of discretion exercised by an employee should not dissuade a court in a political firing case from attempting to analyze the impact a public employee in a particular position is likely to have on the implementation of an administration's programs and policies. Discretion almost always exists and it can safely be assumed that the more responsibility an employee has the more discretion the employee is likely to have. Moreover, an employee with a position of responsibility can have a significant impact on the implementation of an administration's policies even if that employee's discretionary authority is quite limited. *See Nekolny*, 653 F.2d at 1170 ("recogniz[ing] that policymaking and policy implementation may occur at many levels, even within a particular office whose sphere of authority is narrowly circumscribed"). Thus, while discretion is surely an important consideration (where it is measurable), the measure of responsibility exercised by an employee, alone, often tells much about the ability of that employee to affect the ultimate implementation of an administration's policies.

This Court concludes that the plaintiff in this case exercised a significant degree of responsibility. The highway department divided the State of Indiana into thirty-seven subdistricts; thus, plaintiff was directly responsible for the day-to-day repair and maintenance of roads within a significant area of the State.[28] Moreover, as the Seventh Circuit has recognized, the repair and maintenance of public roads is one of the more visible and important functions of local government. *See Hudson*, 913 F.2d at 432 ("seemingly inconsequential [local] matters such as potholes and street lights

---

**27.** This is not to suggest that this Court's opinion, in any way, swims against the tide of Seventh Circuit precedent. Rather, as the following analysis demonstrates, this Court's decision is firmly anchored in the mainstream of Seventh Circuit decisions.

**28.** The potential political significance of the Greencastle subdistrict of the Crawfordsville district of INDOT is increased by virtue of the fact that that subdistrict contains a portion of Marion County, the most densely populated county in the State.

... can be important political issues"); *but cf. Abraham v. Pekarski,* 537 F.Supp. 858, 865 (E.D.Pa.1982), *aff'd,* 728 F.2d 167 (3rd Cir.1984), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Mr. Selch also managed over sixty employees and was responsible for a great deal of very large, very expensive equipment. *Cf. Shakman v. Democratic Org. of Cook County,* 722 F.2d 1307, 1308 (7th Cir.1983) (policymaker *inter alia* "supervised 79 employees"), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983).

In addition, the plaintiff had frequent dealings with the general public and state legislators, as one of his job responsibilities was to handle complaints about the roads in his subdistrict.[29] This responsibility made him a representative of the governing administration in a manner different from the typical receptionist. Not only did Mr. Selch handle complaints but he was the official ultimately responsible for fixing the problems identified to him. Thus, his comments and degree of responsiveness were likely to be taken as representative of the entire highway department by those who sought him out.

Finally, and most importantly in this Court's estimation, Mr. Selch had significant, almost unbridled authority to determine where and when, within his subdistrict, repair work was to be done. It is a fact of life that a state's resources are not limitless; when it comes to highways that means that some potholes will go unfilled so that others can be filled. Thus, an individual who has authority over the ultimate allocation of a significant portion of the state's highway repair activities can have an important and daily impact on the voters who drive within the reach of his authority. While there is no evidence that Mr. Selch ever sought to divert state resources to isolated highways, while neglecting major thoroughfares, or that he scheduled major repair work on an indispensable traffic artery for rush hour, the daily work allocation choices made by Mr. Selch did not have to be that drastic in order to have an impact on the final implementation of the highway department's repair program.

The sheer extent of the many miles of highway the subdistrict supervisor was responsible for meant that it was hard for the district manager to know on any one day where repair work in any single subdistrict was being done. Thus, it was unlikely that there would ever be significant disagreement over what road should be repaired when. However, the fact that disagreement was unlikely made the subdistrict supervisor more a policymaker rather than less one. Perhaps, that is why the Indiana legislature exempted subdistrict superintendents, in addition to highway district managers, from protection from political firings. *See* Ind.Code § 8–23–2–3 (Burns Supp.1990).[30] The degree of responsibility exercised by Mr. Selch in his position as subdistrict superintendent contributes significantly to this Court's finding that political affiliation was an appropriate criteria for the subdistrict superintendent position.[31]

b. The subdistrict superintendent occupied a position from which he could seriously threaten the goals of the in-party.

"Elections often turn on the success or failure of the incumbent to provide ... services." *Tomczak,* 765 F.2d at 641. Indeed, the work and effectiveness of the state highway department was a major issue in Indiana's last gubernatorial election. Thus, it was important to the incoming Bayh administration to have dependable people in positions that would allow the administration to insure the full and thor-

---

**29.** In *Brown v. Trench,* 787 F.2d 167, 170 (3rd Cir.1986), the Third Circuit concluded that a "spokesman" could be discharged based on political affiliation.

**30.** "[T]he statutory designation of a position as 'policymaking,' ... as the considered description of the state legislature, ... is entitled to great weight." *Lohorn,* 913 F.2d at 334.

**31.** In this vein this Court has little difficulty concluding that a subdistrict superintendent "run[s] the show at a substantial component of [state] government." *Bicanic v. McDermott,* 867 F.2d 391, 394 (7th Cir.1989).

ough implementation of the new party's policies. This was not an issue of importance for the Bayh administration only, however. Under our representative system of government this was also an issue of some importance to the voters who put the new governor in office. *See Nekolny,* 653 F.2d at 1170 ("[t]hat ability of the government to implement the will of the people is fundamental to our system of representative democracy").

It might have been contended by Mr. Selch that his goal was simply to provide good, effective road maintenance services and that this was a goal shared by both the Bayh administration and that of the outgoing Republican administration. This, however, is "an unduly myopic view of the role of politics in the seemingly apolitical context of [the] universal provision of services." [32] *Tomczak,* 765 F.2d at 641. Not only could significant disputes have potentially arisen over how those services were to be provided, *see id.,* but the opportunity Mr. Selch had in his position to affect and even to "obstruct" the final dispensing of those services made his job a political one for which party affiliation was a permissible criteria. *See Hudson,* 913 F.2d at 433 (holding that a position's capacity for "potential obstruction of the duties of [a governmental entity—in that case the finance committee of the Chicago City Council] made political affiliation an appropriate consideration"); *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 246 (1st Cir.1986) (political affiliation could appropriately be considered where "the hostile or

foot-dragging actions of any one of the eleven Regional Directors could singlehandedly thwart the Administration's goals in that particular region") (brackets omitted), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).[33]

There can be little doubt that the subdistrict superintendent's ability to decide where and when, within his subdistrict, road work would be done made that position "susceptible to partisan political usage." *Hudson,* 913 F.2d at 433. Mr. Selch "might have felt compelled to conduct [his office] in a way [he] thought beneficial to [the Republican party] and harmful to [Governor Bayh]." *Id.* That, of course, is not to say that Mr. Selch would have conducted himself in such a partisan manner, but it is to say that Mr. Selch does not have a constitutional right to be "in a position to thwart the goals of the in-party." *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2687. Accordingly, Mr. Selch does not have a valid claim that his constitutional rights were violated by his termination from the position of highway subdistrict superintendent.

Judgment will be ordered against the plaintiff, and Mr. Selch will take nothing by way of his complaint.

ALL OF WHICH IS ORDERED.

**32.** It is also apparently not the view of his office that Mr. Selch had when he was hired. This Court has found that Mr. Selch was originally hired because of his political affiliation. *Cf. Hudson,* 913 F.2d at 432 ("[a]s a starting point in considering whether positions are inherently political, [a] district court [is] entitled to note that [an employee was] hired because of their political affiliation").

**33.** This case has much in common with the *Jimenez Fuentes* case in which the 1st Circuit held that the position of regional director of the Puerto Rican Urban Renewal and Housing Corporation (CRUV—Corporacion de Renovacion Urbana y Vivienda) was a position for which politics was an appropriate qualification for the job. Each of the eleven regional directors of

CRUV was charged not so much with making policy as with implementing it. The court reasoned:

> In order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance. The presence of such persons advances the goals of representative government; their absence, in *Elrod's* term, "undercut[s]" such government.

*Jimenez Fuentes,* 807 F.2d at 241.